(928 P.2d 906)
No. 74,687

FRANCIS GIEFER, *Appellee*, v. ROSELLA SWENTON and JOE SWENTON, *Appellants*.

Opinion filed December 13, 1996.

*Justin Lamunyon* and *R. L. Faulkner*, of Faulkner Law Firm, of Enid, Oklahoma, and *Diane S. Worth*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for the appellant.

*Curtis E. Watkins*, of Geisert, Wunsch & Watkins, of Kingman, for the appellee.

Before BRAZIL, P.J., LEWIS, J., and PAUL E. MILLER, District Judge, assigned.

LEWIS, J.: This is the type of dispute which can and has destroyed the integrity of a once close family unit. The cause of such a dispute is generally the death of a parent and the struggle over his or her estate. This case carries such a factual premise.

Johnnie L. Giefer (decedent) had a small farm in Kingman County. His wife predeceased him, and at the time of his death his family consisted of one grown son and six grown daughters. Shortly before and certainly after his death, his son and at least one of his daughters had differences which have grown into what is now probably an irreconcilable family feud. This lawsuit pits one daughter, Rosella Swenton, and her husband Joe against the rest of the family.

At issue in this case is whether the decedent died owning the family farm or deeded it away prior to his death. On September 20, 1990, the decedent executed a deed, absolute on its face, conveying the 320 acres, known as the "home place," which conveyed a $\frac{1}{7}$ interest in the real estate to each of his children as tenants in common. He executed a will (first will) on the same date. He held this deed until March 5, 1993, when he instructed his daughter Bernice Beall to record it. On August 8, 1993, he executed a last will and testament (second will) which contained provisions inconsistent with the deed. Like the first will, the second will left the home place to all seven of his children but provided that his son Francis was to have the absolute right to buy the property from the sisters for $400 per acre. On August 28, 1993, the decedent died.

After his death, all of the sisters but Rosella sold their interest in the home place to Francis. Francis now owns an undivided $\frac{6}{7}$ interest in the 320 acres. The decedent's last will and testament was not offered for probate, was not admitted to probate, and has not been offered or admitted to this day.

After a passage of time, Francis sued Rosella, asking for declaratory judgment and what amounts to specific performance of the provision of the decedent's second unprobated will. Rosella counterclaimed, alleging she owned an undivided $\frac{1}{7}$ interest in the home place by reason of the deed and asked for an accounting of her share of the rents and profits and for partition. The trial court held that the decedent did not intend to convey a present interest

in the real estate by the deed which was recorded March 5, 1993, and canceled the deed. The court then enforced the provisions of the decedent's second will and ordered Rosella and her husband to deed their interest in the property to Francis upon the tendering by Francis of payment under the terms of the second will. The court also denied Rosella's prayer for an accounting and for partition. Rosella appeals from the trial court's decision.

After careful review, we conclude the trial court erred and reverse and remand.

## DEED RECORDED MARCH 5, 1993

We first deal with the deed which was recorded on March 5, 1993. The trial court found that this deed should be canceled because the decedent did not intend that it vest a present interest in the grantees. We conclude this finding is contrary to the evidence and must be reversed.

The legal issue presented is whether the deed was properly delivered. "It is elementary law that before a deed can be operative as a valid transfer of title it must be effectively delivered during the grantor's life." *Agrelius v. Mohesky*, 208 Kan. 790, 795, 494 P.2d 1095 (1972).

"We have said that delivery is largely a matter of the grantor's intention to divest himself of title as evidenced by all the facts and circumstances surrounding the transaction and whether there has been a delivery is ordinarily a question of fact." 208 Kan. at 795-96. However, under certain circumstances, the issue can become a question of law:

"The question of the delivery of a deed is largely a question of intention, ordinarily to be determined by the jury or trial court as a question of fact, but when the facts are not controverted the question should be determined by the court as a question of law, and when the facts have been fully tried, leaving only questions of law to be decided, this court may direct the entry of a proper judgment—following *Worth v. Butler*, 83 Kan. 513, 112 Pac. 111." *Hoard v. Jones*, 119 Kan. 138, Syl. ¶ 9, 237 Pac. 888 (1925).

The deed in question was executed in 1990 and recorded at the express direction of the decedent in 1993. It was never manually delivered to the grantees, although the record indicates that most

of them knew about it prior to the decedent's death. After its recording, the decedent kept it in his possession. It is apparent from these facts that there was no outright manual delivery of the deed in question from the grantor to the grantees. However:

"Defendant further contends that inasmuch as she retained possession of the recorded deed, there was no delivery. We stated in *Fooshee v. Kasenberg*, [152 Kan. 100, 103, 102 P.2d 995 (1940)]:

'It is well settled that the recording of a deed constitutes delivery to the grantee. (*Balin v. Osoba*, 76 Kan. 234, 91 Pac. 57; *Carver v. Main*, 146 Kan. 251, 257, 69 P.2d 681). Where the deed is intentionally recorded by the grantor manual delivery of the deed thereafter is not necessary to make it effectual. (*Turner v. Close*, 125 Kan. 485, 264 Pac. 1047.) In the absence of express disclaimer acceptance by the grantee is presumed. (*Wuester v Folin*, 60 Kan. 334, 56 Pac. 490; *Miller v. Miller*, 91 Kan. 1, 136 Pac. 953.)'

"It seems to be a well-settled rule of law in this state that the recording of a deed constitutes delivery to the grantee, and where the deed is intentionally recorded by the grantor, the manual delivery of the deed thereafter is not necessary to make it effectual. In the absence of express disclaimer, acceptance by the grantee is presumed. [Citations omitted.]" *Hansen v. Walker*, 175 Kan. 121, 124, 259 P.2d 242 (1953).

In *Staats v. Staats*, 148 Kan. 808, Syl. ¶ 3, 84 P.2d 842 (1938), the Supreme Court held: "The recording of a deed is *presumptive* evidence of its delivery, but such presumption can be overcome by other competent evidence." (Emphasis added.) See *Thom v. Thom*, 171 Kan. 651, 653, 237 P.2d 250 (1951); *Turner v. Close*, 125 Kan. 485, Syl. ¶ 2, 264 Pac. 1047 (1928); *Conner v. Cole*, 112 Kan. 517, Syl. ¶ 2, 211 Pac. 615 (1923).

Further, the Kansas courts have held that "where a transfer of property is made without consideration, the inference is that a gift was intended, not that the grantee was to hold the property for the benefit of the grantor. (*Fooshee v. Kasenberg*, 152 Kan. 100, 102 P.2d 995.)" *Hansen v. Walker*, 175 Kan. at 123. In *Miller v. Miller*, 91 Kan. 1, Syl. ¶ 5, 136 Pac. 953 (1913), the court said: "The recording of the deed by the grantor made it effective as to all persons benefited by it who did not dissent."

On the surface, therefore, this is a case in which there is a presumption of delivery and one in which none of the grantees has

stepped forward to reject any gift bestowed upon them by the decedent.

As we read the Kansas cases, most of the instances in which a presumption of delivery by recording was overcome were cases in which the deed was not recorded by or at the direction of the grantor. Indeed, in these decisions, cases to the contrary are distinguished because in those cases, the grantor himself had recorded the deed. See, *e.g., Staats v. Staats*, 148 Kan. at 812; *Turner v. Close*, 125 Kan. at 489. In those cases, where a deed absolute on its face was recorded by or at the direction of the grantor, the presumption of delivery was upheld. *Hansen v. Walker*, 175 Kan. 121; *Thom v. Thom*, 171 Kan. 651; *Conner v. Cole*, 112 Kan. 517.

In this case, the evidence shows, beyond any doubt, that the deed was recorded at the express direction of the grantor. The only witness as to the actual intention of the decedent in executing and recording the deed was his daughter Bernice, who testified concerning the recording as follows:

"Q.  All right. And what were the circumstances surrounding the recording of that deed?

"A.  I went out to my dad's place. He was very sick. He had a lot of back trouble, pain, feeling bad and I took him to the heart doctor that day in Wichita and we discussed it the day that I went out there about taking care of his business. *And daddy gave me the deed that he signed and told me to go record it at the courthouse, that he thought that that would be the appropriate thing to do because he knew that he wasn't feeling good.*" (Emphasis added.)

We conclude from the undisputed evidence in this case that the deed was recorded at the express direction of the grantor and the recording raised a presumption of delivery.

How can the presumption of delivery be overcome? Obviously, there must be evidence that despite the recording of the deed, the grantor had no intention to deliver it. In 23 Am. Jur. 2d, Deeds § 124, p. 159, we find: "When the evidence establishes that the property owner does not intend to pass a present interest in the property, then as between the parties there is no binding delivery even though the deed is recorded."

We think that such a rule is a common-sense approach to the issue, and we adopt it for application in this case. It appears to us

that in order to overcome the presumption of delivery in this case, it must be shown that the grantor intended to die vested of an ownership interest in the property. In this case, the deed contains no reservations or qualifications, so it was either a fee simple grant or the grantor intended to die vested of ownership in the property despite having executed and recorded the deed.

The trial court found that "[o]n March 5, 1993, Johnnie Giefer clearly did not intend to vest a fee simple interest in and to the home place in his seven children." We conclude that this finding is not only contrary to the evidence but that it is contrary to a portion of the court's conclusion of law No. 4. In conclusion of law No. 4, the trial court said: "The Court further concludes that the sole purpose of Johnnie Giefer's execution of the September 20, 1990, deed and his authorization to place it of record in March, 1993, *was to avoid probate and give effect to Francis Giefer's first right to purchase the home place pursuant to the September 20, 1990, will.*" (Emphasis added.)

With all due respect to the trial judge in this case, we are unable to determine how an individual can intend to avoid probate by executing and recording a deed to all of the real estate he owns and not have that deed convey his interest to the grantees. If the deed does not convey a present interest, then it does not avoid probate. The only conceivable manner of upholding the decedent's intent to avoid probate is to find that he intended to convey a fee simple interest to his children by the deed recorded in March 1993. The decision of the trial court to cancel the deed because defendant did not intend to vest a present interest in his children is contrary to the trial court's conclusion that the deed was recorded pursuant to decedent's intention to avoid probate. The trial court cures that oversight by giving full force and effect to an unprobated will. As will be pointed out later, this is simply not possible. In addition, the recording of the deed was, if anything, counterproductive to Francis' first right to purchase under the will. All the decedent had to do to give Francis the first right to purchase the home place was to own the real estate when he died. He apparently chose not to do so. We hold the trial court's finding of fact that decedent did not intend to vest a present interest in his children

is contrary to its conclusion that the deed was recorded to avoid probate.

The next question for us to determine is what the intent of the decedent was in recording the deed on March 5, 1993. Before we can answer that question, we must determine the proper method of approaching it.

At one time in this state, a conversation with a decedent was not admissible into evidence. If that were the case in the instant matter, the decision would be relatively easy. The only evidence of the decedent's true intent comes from conversations he had with his daughter Bernice. It is true there is the usual general evidence that he always intended for Francis to be able to purchase the home place. However, the conversations with Bernice are quite specific as to the subject at hand. Those conversations would not have been admissible at one time in this state, and there would be no evidence other than the deed as to the decedent's intent.

The decision in *Thom v. Thom*, 171 Kan. 651, offers us some difficulties in resolving this issue. In that case, the Supreme Court appears to limit the determination of the grantor's intention to an examination of the instrument in question.

"Thus, since we have said that in the construction of deeds the intention of the grantor as gathered from an examination of the instrument in its entirety is controlling (See *Epperson v. Bennett*, 161 Kan. 298, 167 P.2d 606, *Bennett v. Humphreys*, 159 Kan. 416, 155 P.2d 431, and *Howe v. Howe*, 94 Kan. 67, 145 Pac. 873), *it clearly appears our primary concern is with the contents of the instrument in question and our duty is to examine them for the purpose of ascertaining whether the trial court was correct in concluding they disclose an intent on the part of the grantor to pass a present interest in the lands therein described.*" (Emphasis added.) 171 Kan. at 653.

The court went on to conclude that it was the intent of the grantor to convey a present interest: "[W]e . . . hold there is nothing in the wording of the defendant's deed warranting a conclusion that instrument was intended to be testamentary in character and that it must be construed as a deed conveying him a present interest in the land therein described." 171 Kan. at 656.

If this case were to follow the precedent of the *Thom* decision and determine the intent of the decedent from an examination of

the deed, it would be relatively simple to conclude that the deed vested a present interest in the grantees. As we have said before, there are no reservations or qualifications of any kind in the deed. It is an outright grant of an undivided $\frac{1}{7}$ interest to each of the decedent's seven children as tenants in common.

It appears to us that the decision in *Thom* is consistent with the then-prevailing rule that prohibited the admission of a conversation with the decedent into evidence. Under that rule, there was not much else to look at other than the form of the instrument itself. We do not believe that *Thom* should exclude from the evidence in this case conversations with the decedent when those conversations are plentiful and were admissible. We believe, however, that an examination of the deed and the search for a grantor's intent remains one of the pieces of the puzzle that must be considered. In this case, that factor clearly points to an intent to vest a present title in the grantees.

The trial judge in this case construed the deed along with two unprobated wills executed by the decedent. In doing so, he said:

"It is well settled that where two or more instruments are executed by the same parties contemporaneously or at different times in the course of the same transaction concerning the same subject matter, they will be read and construed together so far as determining the respective interests of the parties, even though the documents do not refer to each other. *Harder v. Wagler*, 17 Kan. App. 2d 403, 838 P.2d 366 (1992) and *Hollenbeck v. Household Bank*, 250 Kan. 747, 829 P.2d 903 (1992). This Court specifically concludes that the first will of September 20, 1990, the deed of September 20, 1990, and the second will of August 8, 1993, are all part of the same transaction (i.e. Johnnie Giefer expressing his desires as to the disposition of the home place) and concern the same subject matter (i.e. the disposition of the home place)."

We conclude the trial court erred in this method of construction. The decisions of *Hollenbeck v. Household Bank*, 250 Kan. 747, 829 P.2d 903 (1992), and *Harder v. Wagler*, 17 Kan. App. 2d 403, 838 P.2d 366, *rev. denied* 251 Kan. 938 (1992), stand for the proposition that two or more instruments executed in the course of the same transaction concerning the same subject matter may be construed together. However, the instruments in *Hollenbeck* and *Harder* were all intended to operate immediately. In this case, the trial court attempted to construe a deed, which was intended to

take effect immediately, along with two unprobated wills executed by the decedent. We consider this to be mixing apples and oranges. A will is a testamentary disposition which has no application until after the testator is deceased *and it has been admitted to probate*. We do not believe that it is reasonable to construe the intention of the testator in executing a deed which is an inter vivos document conveying a present interest in real estate with contrary provisions in decedent's two unprobated wills. These documents are so divergent that we believe they should not be construed together.

In the final analysis, however, this case is controlled by the testimony of Bernice Beall. Bernice was a real estate broker in Oklahoma City, and she was her father's legal advisor and confidante. Bernice discussed estate planning with her father, how he could avoid probate, etc. Her advice certainly may not have been accurate. However, her testimony is persuasive on the intention of the decedent in executing the two wills and recording the deed in question.

Bernice testified on the intent of her father as follows:

"Q. And what was the purpose or your thinking with respect to the deed?

"A. *The deed—He wanted—I'm sorry, repeat the purpose.*

"Q. *I just was wondering the deed—why the Will and the deed together?*

"A. *Okay. The deed—the purpose of the deed was to convey it to all seven of the children—*

"Q. *Uh-huh.*

"A. *—with the Will to back up my dad's wishes of what he wanted done with this Will because my dad was a smart man and he wanted to avoid a lot of extra expenses. And him and I sit down and discussed this together and he understood with me that by doing the deed that his kids would avoid a lot of extra cost and by drawing the Will up to go with it he explained in the Will what he wanted us to abide by in the deed by giving us each 1/7th portion of it."* (Emphasis added.)

Later, she testified:

"Q. Okay. You understand that—Do you think your father had a problem with Rosella owning part of that farm?

"A. No. He intended for her to have her 1/7th."

She also testified:

"Q. Okay. Now, why was this—Were you responsible or have any impact in the recording of that deed in March the 5th of 1993?

"A. *I had a discussion with my dad and this is what my dad's wishes was. He asked me to go record the deed.*

. . . .

"Q. Okay. So what was your understanding as to why that—this deed was to be recorded?

"A. *To avoid probate, to avoid the family a lot of unnecessary charges and to allow us each to have ownership—to allow us to have ownership of the property. Make—To make it a legal—of legal record.*

"Q. *Okay. So you understand that that gave each of the children a legal ownership in the property; is that correct?*

"A. *Yes, I did.*

"Q. *Okay. And had you explained that to your father?*

"A. *Yes, I did.*

"Q. *So he understood that that gave everyone a ⅐th interest in that; is that correct?*

"A. *Yes.*" (Emphasis added.)

At some point shortly before his death, the decedent sold a 160-acre tract to Francis. As consideration, he took back a note for $85,000 payable to each of his six daughters and a mortgage on the 160-acre tract. Bernice explained this transaction as follows:

"Q. Okay. What did he want done with that—that 160 acres where the deed was prepared?

"A. He had something else in mind.

"Q. Okay. Did he have in mind for each child to receive ⅐th of that 160 acres?

"A. He had in mind what was specified in the Will that he wanted each child to receive ⅐th of the 85,000, that he wanted Francis to have the farm.

Q. Okay. But he did not want—he did not want that property, that 160 acres, to go to anybody else other than Francis then, is that what you're saying?

"A. He definitely wanted it to go to Francis, yes.

"Q. Okay. But why—So why was—In your estimation why was not that deed recorded?

"A. My dad never did sign that deed. He never did want that deed. He never wanted that one done like that. He wanted to do it another way.

"Q. Okay. He wanted the—to do the first piece of property we talked about, he wanted to convey it ⅐th [to] each [child], right?

"A. Right.

"Q. The other one, 160 acres, he wanted it to go now—how now?

"A. He did not want it conveyed the same as the 360 acres. He chose to do it another way.

"Q. As a matter of fact, he sold it to his son while he was alive and took a mortgage on it, correct?

"Q. Yes.

"A. Okay. And he could have done that with the other property, couldn't he, if he wanted to?

"A. It was his decision.

"Q. Sure. Sure. But he decided he wanted to handle that a different way, correct?

"A. Right.

"Q. Okay. So one piece of property he wanted to be divided ⅐th to all the children, the other piece of property he wanted sold to his son with a mortgage and that mortgage to be divided amongst the seven children; is that correct?

"A. Correct."

At one point, Bernice indicated she did not understand why her father wanted a second will.

"Q. Did you express to Mr. Wetta that there would have been a deed conveying that property?

"A. *I expressed to him that the property has already been conveyed.*" (Emphasis added.)

As to whether the decedent understood the nature and purpose of the deed which was recorded, Bernice testified:

"Q. Okay. So it's your understanding that he understood the significance of a deed and what it did?

"A. I explained it to him and he did understand it at the time that he did sign it.

"Q. Okay. He understood that it conveyed the property to the children?

"A. Right.

"Q. *Do you understand the term fee simple?*

"A. *Yes, I do.*

"Q. *Okay. Was it conveyed fee simple?*

"A. *Yes.*" (Emphasis added.)

One interesting question on the subject of decedent's intent is whether he understood that he no longer owned the property after the deed was recorded. Bernice testified that he fully understood this:

"Q. With respect to both pieces of property now, the 320 acres and the 160, what was his understanding as far as you knew with respect to the control of the property? Did he have control of the property?

"A. *He understood that he no longer owned the property but at the same time that he had all the rights and would receive all the income from the property and would continue to live on the property, that nothing would change in his way of living there or controlling the crops. It would still be all the same, just that we was protecting him upon his death.*" (Emphasis added.)

Bernice later testified on her father's intent as follows:

"A. Because that's what he told me that he wanted to do at that time. He wanted that deed recorded on—You talking about the 360 acres, right?

"Q. Yeah. Because he said he wanted it recorded, right?

"A. Right.

"Q. And that's exactly what you did, right?

"A. Yes.

"Q. And it conveyed the property to him, right, to the seven children?

"A. Right.

"Q. So that's what you are saying was his intent that the children to have a ⅐th interest?

"A. Right. . . . .

"Q. His intent was to have each child to have a ⅐th subject to the right of Francis to purchase, correct?

"A. Correct."

Delores Hughes, one of the daughters of the decedent, testified that she knew that she did not have to convey her interest in the property to Francis but that she did so because that is what her father wanted. It is interesting to note that Delores and her husband, however, in their deed to Francis reserved their interest in the minerals for a period of 17 years. This indicates that Delores and her husband certainly believed they received a present interest in the real estate at the time the deed was recorded.

Bernice was finally called as a witness for the defendants and, when asked about her concern over why the second will was being executed, testified:

"A. I—In thinking about it, I voiced a concern that he drew up another Will because daddy already did a Will and the deeds and *actually owned no property at that time that he drew that Will up.*" (Emphasis added.)

It is perfectly clear that the decedent knew what he wanted to

do when it came to deeding the home place. For instance, the decedent knew how to convey the 160-acre tract to Francis and take back from Francis a mortgage and a note payable to his daughters. In this manner, he avoided owning the real estate at the time of his death and saw to it that the note and mortgage would not be included in his estate and would not be subject to probate. Bernice also testified that she prepared a deed for the decedent in which he would deed the 320 acres to the seven children and reserve a life estate. However, she indicated that the decedent refused to sign this deed and refused to take that option because he "wanted to do it another way." There appears to us to be overwhelming evidence that the decedent knew exactly what he wanted to do. He did not want to die owning this real estate, and he did not want this real estate to be subject to probate. In order to avoid that, he deeded it and prepared a contrary will. It is true that from the time decedent recorded the deed to the home place until the time of his death, he continued to act as if he owned the home place. We do not consider this to be significant evidence that he did not intend for the deed to convey a present interest in the home place to his children. It simply indicates that he was an individual who usually got his way as far as his children were concerned and who made every effort to avoid probate and still control the devolution of title to his property.

The evidence in this case is overwhelming to the effect that the decedent intended to deed a present interest in the home place to his children. There was virtually no solid evidence to the contrary. The form of the deed and the fact that decedent instructed Bernice to record it, along with Bernice's testimony that her father intended to convey a fee simple title to his children, are all contrary to the trial court's finding that the decedent did not intend to convey a present interest in the real estate. We hold that, as a matter of law, the evidence establishes that decedent intended to convey the home place to his children by the deed recorded March 5, 1993. The trial court's conclusion to the contrary is reversed.

It appears to us that the decedent was motivated by a desire to avoid probate and attorney fees. He avoided probate by deeding all of his real estate to his children prior to his death. He left a

written statement directing that all of his machinery, cattle, monies, etc., be divided equally among his children. He wanted his son to be able to buy the home place. He attempted to do this by executing a will which was contrary to the deed and which contained these instructions. The problem, as Bernice noted, was that he owned no property on which the will could operate. The decedent wanted to avoid probate, give away his property, and still control its devolution after his death. This is not possible.

We think it admirable that five of the daughters sold their share to Francis, even though they knew they did not have to. Perhaps this is what the decedent believed would happen. Rosella, however, was no more obligated to comply with the terms of the decedent's unprobated will than the others, and she chose not to do so. She still owns an undivided $\frac{1}{7}$ interest in the home place and is entitled to an accounting of her share of the rents and profits. She is also entitled to partition the real estate if she has properly invoked that remedy. Whether she has must be determined on remand.

## THE UNPROBATED WILL

The trial court gave effect to the unprobated second will and ordered Rosella to comply with its terms. That decision is clearly erroneous and is reversed.

The trial court concluded: "[I]t makes no sense to require a formal probate of the second will in order to give life to paragraph SIXTH of said will."

It may not make sense, but it is the law of this state. K.S.A. 59-616 provides: "No will shall be effectual to pass real or personal property unless it shall have been duly admitted to probate." This statute is clear and unambiguous, and we will not nullify its effect simply because it makes "no sense" to comply with it.

The trial court erred in giving effect to decedent's unprobated will, and all orders based on that document are reversed.

Our decision on the delivery of the deed in question should nullify any need to probate the will of the decedent. However, if probate should become necessary, questions relating to that procedure are left for future determination.

The decision of the trial court is reversed, and the matter is remanded with instructions to: (1) order and supervise an accounting by Francis to Rosella of her share of the rents and profits of the 320-acre home place; and (2) determine if Rosella has properly asked for partition and, if so, order that partition.

In closing, we feel compelled to note that Francis owns an undivided $^6\!/_7$ interest in the real estate in question. His percentage of ownership in the real estate should intimidate other bidders at a partition sale. The probable outcome of a partition action is obvious, and it will come at great expense to the family.

Reversed and remanded.