(935 P.2d 218)
No. 75,907

GEORGE M. PARSONS and LINDA M. PARSONS, *Appellees,* v. BISCAYNE VALLEY INVESTORS LIMITED, L.P., formerly BISCAYNE-VALLEY INVESTORS, LTD.; JETZ SERVICE CO., INC.; BOARD OF COUNTY COMMISSIONERS OF SEDGWICK COUNTY, KANSAS; TOM'S SEWER SERVICE and AUGUST L. THORNE; ROOF MECHANICS, INC.; ENRIQUE J. RODRIQUES d/b/a HURRICANE MAINTENANCE; ALAN'S PAVINGS and ALAN SCHWAB; *Defendants,* and THE MISSION BANK, *Appellant.*

Opinion filed March 28, 1997.

*Phillip A. Miller* and *Jerald S. Meyer*, of Armstrong, Teasdale, Schlafly & Davis, of Kansas City, Missouri, for appellant.

*Philip L. Bowman* and *Laura L. Ice*, of Adams, Jones, Robinson & Malone, Chartered, of Wichita, for appellee.

Before GREEN, P.J., ELLIOTT, J., and CARL B. ANDERSON, JR., District Judge, assigned.

GREEN, J.: This mortgage foreclosure action involves a dispute over the lien priorities between the first and second mortgage holders. George M. Parsons and Linda M. Parsons were holders of two promissory notes relating to two loans that they made to Biscayne Valley Investors Limited, L.P. (Biscayne Valley). Each promissory note was secured by a first mortgage on an apartment complex. The Mission Bank (Bank) held a blanket second mortgage on both apartment complexes. Under a modification agreement, to which the Bank gave its consent, the Parsons contended that the combined indebtedness owed to them under the two promissory notes had priority over the mortgage lien of the Bank. The trial court agreed, stating that the modification agreement allowed each apartment complex to become security for the indebtedness of the other apartment complex. On appeal, the Bank contends that the trial court erred in determining that the modification agreement gave the Parsons a lien priority over the Bank's lien. We disagree and affirm the judgment of the trial court.

The facts of this case are not in dispute. Biscayne Valley executed a promissory note in the amount of $701,525 in favor of the Parsons. The note was secured by a mortgage on the Biscayne Apartments. In a separate transaction, Biscayne Valley executed a second promissory note in the amount of $767,000 in favor of the Parsons. This note was secured by a mortgage on the Valley View Apartments. Both transactions took place on December 27, 1983, and the Parsons recorded both mortgages on December 29, 1983.

Biscayne Valley also executed a $300,000 promissory note in favor of the Bank. This note was secured by a blanket mortgage upon both properties. Although the Bank recorded its mortgage on December 29, 1983, the Bank recorded its mortgage after the Parsons had recorded their mortgages. The facts are undisputed that the Parsons held first mortgages on each property and the Bank held a blanket second mortgage on both properties.

The mortgages executed in favor of the Parsons were due and payable on December 27, 1993. In December 1993, the Parsons and Biscayne Valley began negotiating an extension on the mortgages. The parties had the properties appraised. Because the appraised value of the Biscayne Apartments was not much greater than the amount owed the Parsons, the Parsons wanted a lump sum payment of $150,000. This payment would be used to reduce the Biscayne Valley mortgage. The Parsons also wanted certain repairs to be made to both properties.

When Biscayne Valley could obtain only a $75,000 loan from the Bank, the Parsons and Biscayne Valley entered into a modification agreement which required that the $75,000 be applied to the Biscayne Valley mortgage, reducing the Parsons' mortgage to $512,000. Essentially, the modification agreement provided that the Biscayne Valley and Valley View notes would be amortized over 15 years. The modification agreement also included a list of scheduled repairs and improvements to both properties and provided for cross-collateralization such that each mortgage secured the debt under its own note as well as the note and mortgage on the other property. As a condition of its consent to the modification agreement, the Bank required that the modification agreement prohibit the Parsons from making any further principal advances under their notes. After such language was added, the Bank executed its written consent to the modification agreement.

When the Parsons declared Biscayne Valley in default after it failed to make monthly payments, the Parsons contended that the cross-collateralization provision of the modification agreement allowed them to look to both properties for the monies owed them. In essence, they argued that they had first lien to the full extent of the debt on both properties. To the contrary, the Bank argued that

the cross-collateralization provision merely gave the Parsons a third lien for any deficiency that they might incur in foreclosing one of their mortgages.

After a bench trial, the court agreed with the Parsons, finding that theirs was the only plausible construction of the contract. The trial court found that the modification agreement was unambiguous and that the Parsons could reach both properties for the total amount owed to them under each mortgage. In the alternative, the trial court found that even if the modification agreement was ambiguous, the parties intended that the Parsons be able to reach both properties for the total amount owed them.

In agreeing that the modification agreement is unambiguous, the Bank argues that the trial court erred in concluding that the Bank's consent to the cross-collateralization clause evidenced consent to a first lien on both properties to the full extent of the entire debt owed the Parsons. The Bank further argues that the trial court erred in its alternative finding that, if the contract is ambiguous, the parties intended that the Parsons have a first lien to the full extent of the mortgages due on both properties.

Also agreeing that the modification agreement is unambiguous, the Parsons argue that the Bank's actions surrounding the negotiation of the agreement indicate a clear intent to be bound by the cross-collateralization provision. The Parsons argue that the Bank's express consent to the modification agreement, the Bank's participation in the negotiation process, and the Bank's insistence on a clause prohibiting further advances demonstrate the Bank's intent or acknowledgment that the Parsons have a first lien covering the amount owed under both mortgages.

The determination of the modification agreement's effect upon the parties' relative lien priority involves construction of the modification agreement. Interpretation of a written contract is a matter of law over which this court has unlimited review. "Regardless of the construction of the written contract made by the trial court, on appeal a contract may be construed and its legal effect determined by the appellate court." *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987). See *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, Syl. ¶ 3, 829 P.2d 884 (1992). If

a contract is unambiguous, the court can look only to the four corners of the agreement to determine the parties' intent, harmonizing the language therein if possible. *Brown v. Lang*, 234 Kan. 610, Syl. ¶¶ 1, 2, 675 P.2d 842 (1984); *Wiles v. Wiles*, 202 Kan. 613, 619, 452 P.2d 271 (1969); see *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, Syl. ¶ 3, 738 P.2d 866 (1987).

Generally, the Bank argues that no individual provision in the modification agreement supports the trial court's conclusion that the Bank intended to subordinate its lien priority. Specifically, the Bank refers to the cross-collateralization clause, paragraph 1.D. of the modification agreement, which provides:

"A default in the terms and provisions of either the Biscayne Note and Mortgage or the Valley View Note and Mortgage shall constitute a default under each Note and Mortgage. . . . It is further expressly agreed that each respective Mortgage shall secure, in addition to the debt evidenced by the respective Notes, the liabilities under the other Note and Mortgage securing it, and any other liabilities of the Borrower to the Lender, direct or indirect, secured or unsecured, now due or to become due."

The Bank argues that the cross-collateralization clause only means that each apartment complex serves as collateral for the other. The Bank contends that the cross-collateralization merely gives the Parsons a third priority position on each of the properties which was behind the Bank's second mortgage. The Bank further argues that its consent to the modification agreement cannot be construed as evidence of an intent to subordinate its lien position. In its brief, the Bank argues that its consent to the modification agreement served to insure the Parsons that the Bank would not foreclose, since it arguably could foreclose based upon the default in the Parsons' notes and mortgages. The Bank reasons:

"The Biscayne and Valley View Notes had matured and were not paid at maturity. . . . This would have permitted the [Parsons] to foreclose which, in turn, would have permitted the Bank to foreclose. . . . The Bank agreed to not accelerate its loan in consideration of the terms of the extension being granted by Plaintiffs."

Although the trial court did not address the individual contract provisions, the court found that the modification agreement as a

whole demonstrated the Bank's intent to subordinate its lien priority position. The trial court stated:

"For the record, the Court finds that Paragraph 1.D of the modification agreement is clear and unambiguous and requires no judicial interpretation for determining its meaning. The real issue in this case is determining the significance of the bank's consent to the modification agreement. The Court finds that the bank's consent is just that, an acquiescence by the bank to the terms and legal significance of the cross collateralization clause. *The cross collateralization clause means that the plaintiffs' entire debt is secured together by both pieces of property. The bank expressly consented to this clause. Therefore, to the extent that the clause alters or impairs the bank's interest in the property, the bank has acquiesced to these terms.* This is the most logical reason why the plaintiffs asked the bank to consent to the agreement in the first place. The plaintiffs didn't need the bank's consent unless the document in some way impaired the bank's rights or interest in the property." (Emphasis added.)

" 'A cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistent with legal principles.' " *Garvey Center, Inc. v. Food Specialties, Inc.*, 214 Kan. 224, 229, 519 P.2d 646 (1974). The Parsons' mortgages on the Biscayne Valley and Valley View properties, the Mission Bank mortgage, and the modification agreement should be construed together to determine the intent of the parties. See *Hollenbeck v. Household Bank*, 250 Kan. 747, 752, 829 P.2d 903 (1992) ("Documents which are executed at different times, but in the course of the same transaction concerning the same subject matter, will be construed together to determine the intent of the parties to the contract."). In the instant case, the modification agreement refers to the Biscayne Valley, Valley View, and Bank mortgages. Additionally, the documents concern the same subject matter. Therefore, it is appropriate to construe all of the instruments together. Moreover,

"[w]here the construction of a mortgage is brought in issue the primary question for determination is what was the intention of the parties. In arriving at a decision of the matter, all the circumstances attending the execution of the mortgage and the nature of the transaction are to be considered as well as the language of the instrument itself. [Citation omitted.]" *Emporia State Bank & Trust Co. v. Mounkes*, 214 Kan. 178, 181, 519 P.2d 618 (1974).

Review of all the documents as well as the circumstances surrounding the execution of the modification agreement supports the conclusion that the parties intended that the Parsons have a first lien with respect to the full indebtedness owed them on both mortgages.

First, the cross-collateralization clause would be meaningless given the construction proposed by the Bank. The Bank argues that the cross-collateralization clause merely gives the Parsons a third priority position behind the Bank with regard to either property. However, the Parsons would not need the Bank's consent if the cross-collateralization clause gave the Parsons a priority position *behind* the Bank. Clearly, neither the Parsons nor. Biscayne Valley needed the Bank's express consent to the modification agreement, if the modification agreement did not affect the Bank's lien priority position. The Bank's argument that the Parsons needed the Bank's consent to insure that the Bank would not foreclose is inconsistent with the Bank's action in making the $75,000 loan. It is inconceivable that the Bank would invest additional funds in the properties if they intended to foreclose. Moreover, the modification agreement does not impair the Bank's foreclosure rights. As a result, the Bank retained its rights to foreclose upon default.

Second, the Bank predicated its consent to the modification agreement upon the inclusion of paragraph nine, which prohibits further advances of principal funds by the Parsons to Biscayne Valley. Significantly, this provision would also be meaningless under the Bank's construction of the modification agreement. Clearly, the Bank would not want further advances of funds made if such advances would erode its position by increasing the debt of the first priority lienholder. However, if future advances would be subject to a third priority position, as the Bank argues, the Bank would have no reason to oppose such advances. The Bank's contentions with regards to the cross-collateralization clause and the prohibition on future advances are unreasonable. "Reasonable rather than unreasonable interpretations are favored by the law." *Hollenbeck v. Household Bank*, 250 Kan. at 753.

Third, the Biscayne Valley mortgage includes the following provision:

"Mortgagor shall not grant any other mortgage on the mortgaged property or any interest therein without the written consent of Mortgagee, which consent shall be in Mortgagee's absolute discretion. Be it specifically provided, however, *Mortgagor shall be permitted to grant a Second Mortgage* subordinate *to the Mortgage being granted to Mortgagee hereunder to Mission Bank, Mission, Kansas*, or its assigns, securing a Promissory Note not to exceed the principal amount of Three Hundred Thousand Dollars ($300,000) . . . ." (Emphasis added.)

This clause expresses the Parsons' intent to maintain a first priority position. It is unlikely that the Parsons negotiated an agreement wherein they would receive anything less. The trial court's conclusion that the parties intended that the Parsons have a first priority lien with regard to its total indebtedness is consistent with this provision of the Biscayne Valley mortgage.

Finally, the Parsons argue that this case is analogous to *First State Bank v. Hoehnke Nursery Co.*, 667 P.2d 1022 (Or. App. 1983). In *Hoehnke*, the Capital Investment Co. (Capital) and the bank extended separate mortgages to a financially floundering nursery. Capital's mortgage was superior to the bank's interest. When the nursery encountered financial problems, Capital and the bank entered into a participation agreement wherein they provided the nursery with additional capital. The agreement reiterated Capital's first priority position and the bank's second priority position. Later, the bank advanced additional funds. To secure these funds, the nursery owners executed an additional mortgage and a trust deed upon their residence. They also executed a cross-collateralization agreement providing that both the residential and nursery property acted as security for the bank's advances and that default in either debt entitled the bank to foreclose upon either or both properties.

Upon default, Capital argued that the cross-collateralization clause merely provided the bank with a first priority position as to the individual debt for each loan. In disagreeing, the *Hoehnke* court emphasized that Capital was aware of the execution of the cross-collateralization agreement and found that Capital "agreed to structure the transaction in the form it finally took." 667 P.2d at 1028. Therefore, the court concluded that the separate collateral for each advance secured the total debt owed to the bank.

The Parsons argue that this court should follow the *Hoehnke* court and construe the Bank's consent to the cross-collateralization modification agreement as consent to a first priority position with regard to their total indebtedness. The Parsons emphasize that the Bank expressly consented to the modification agreement and the cross-collateralization provision, whereas the *Hoehnke* court found simple knowledge of the cross-collateralization agreement sufficient to bind the bank therein. We find the *Hoehnke* decision persuasive. Based upon the modification agreement, the underlying documents, and *Hoehnke*, the trial court did not err in concluding that the parties intended that the Parsons have a first lien on both properties to the full extent of their indebtedness under both mortgages.

Because of our holding, we need not address the Bank's second issue. Nevertheless, we will address this issue because we believe the trial court's alternative reason for finding in favor of the Parsons is also valid. In its second issue, the Bank argues that the trial court erred in making an alternative finding that the modification agreement was ambiguous. In making this alternative finding, the trial court stated:

"As an alternative ruling, even if the modification agreement and consent thereto are not clear and unambiguous, the court finds from the evidence in this case that the parties intended that the bank's interest in the properties would be subordinate to the plaintiffs' interest as set forth under the cross collateralization clause. In other words, the Court finds from the evidence that it was the intent of the parties that the plaintiffs have a first lien on both properties to the full extent of all indebtedness due to the plaintiffs."

Where a contract is ambiguous or uncertain, the parties' intent may be determined from all the language used in the contract, the circumstances existing when the agreement was made, the object sought to be obtained, and other circumstances, if any, which tend to clarify the intention of the parties. *Amortibanc Investment Co. v. Jehan*, 220 Kan. 33, 43, 551 P.2d 918 (1976). Whether an ambiguity exists in a written instrument is a question of law for the court. *St. Paul Surplus Lines Ins. Co. v. International Playtex, Inc.*, 245 Kan. 258, 271, 777 P.2d 1259 (1989).

The Bank argues that this court should not consider the testimony of the Parsons' attorney, Robert Sherwood, because the Parsons failed to lay a proper foundation for his testimony. They argue that the trial court erred in overruling their objection as to Sherwood's lack of personal knowledge. The admission of evidence is a matter of trial court discretion. *State v. Warden*, 257 Kan. 94, 115, 891 P.2d 1074 (1995). Judicial discretion is abused when no reasonable person would take the view adopted by the trial court. *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 804, 897 P.2d 123 (1995).

Before the Bank's objection, Sherwood testified extensively as to his role as the Parsons' attorney with regard to the properties. His testimony indicated that he was intimately involved in the negotiation of the modification agreement and that he made several suggestions to the Parsons which were incorporated into the modification agreement. Consequently, it cannot be said that no reasonable person would have agreed with the trial court's decision to admit the testimony.

The Bank specifically objected to Sherwood's testimony that the Bank's consent to the modification agreement meant that the Bank agreed that a deficiency on one property could be satisfied by the sale of the other property. Sherwood testified that this expectation was the reason he sought the Bank's consent. On cross-examination, the Bank elicited testimony that Sherwood never discussed or suggested that the Bank expressly subordinate its lien position. Sherwood emphasized that he believed subordination was unnecessary in that the Parsons already had a first priority position.

Clay Coburn, Jr., Mission Bank's executive vice president, testified on behalf of the Bank. Coburn testified that sophisticated parties would use the term subordination to indicate a proposed change in lien position. Coburn testified that the Bank agreed to advance $75,000 on its existing future advance mortgage in order to pay down the first mortgage in consideration for the first mortgagees extending their loan. Coburn emphasized that the $75,000 pay down kept the Bank in the same position because the Bank's relative priority position remained unchanged. Coburn testified that the Bank would not have agreed to subordinate its lien priority

position. In testifying that the Bank was interested in getting the first mortgage extended because it would eventually improve the Bank's position, Coburn stated:

"[S]ince the first mortgage loans had matured, [the Bank was not] interested at that point in time in accelerating—acceleration of those mortgages. So [the Bank was] willing to, in consideration of the—of the first mortgagees extending their loans, we were willing to do all of the things that are set out in this modification, including the cross default provision."

Coburn testified that the cross-collateralization provision merely gave "the first mortgagee a third position on each of the properties which obviously was behind our second position, so [it] did not— that did not adversely affect [the Bank]." Coburn explained that the lien priority could only be changed "if there were actually a subordination."

Finally, Coburn's testimony with regard to trial Exhibit X was significant in that it contrasted sharply with his earlier testimony. Exhibit X was the Bank's numerical analysis of its position with regard to the properties at the time it entered into the modification. Coburn testified that he created the exhibit. In doing so, he totaled the appraised values for the properties for a single total value of the collateral. Beneath the total appraised value, Coburn totaled the first mortgages. Next, he listed the Bank's second mortgage. Subtracting the total first mortgages and the Bank's second mortgage from the appraised value, the document demonstrated that the value was sufficient to pay off both mortgages. Questioning Coburn, the Parsons emphasized that the Bank did not "separately figure the bank's position vis-a-vis the first mortgages as to each property." Nor did the Bank's calculations demonstrate consideration of any part of the first mortgages as third mortgages. The document was structured as follows:

"BISCAYNE ANALYSIS

"APPRAISED VALUES:

| | |
|---|---|
| Biscayne Valley | $  650,000 |
| Valley View | 1,000,000 |
| | $1,650,000 |

| "FIRST MORTGAGES: | AMOUNT | DEBT SERVICE |
|---|---|---|
| Biscayne Valley | $ 512,000 | $ 63,488 |
| Valley View | 642,000 | 79,608 |
| | $1,154,000 | $143,096 |
| "SECOND MORTGAGE | 266,248 | 34,800 |
| | $1,420,248 | $177,896 |
| "LOAN TO VALUE | 86%" | |

As Exhibit X indicates, the Parsons' first mortgages had a very high ratio to appraised value. The ratio of the first mortgages to appraised value was approximately 70 percent. As a result, the Bank was facing a possibility that it could lose its entire investment if the Parsons would not agree to extend their loans. The exhibit and the other evidence demonstrated that the Bank hoped by the Parsons agreeing to extend their loans, the very high ratio of first mortgages to appraised value would gradually reduce over time, thus reducing the Bank's risk of loss. Consequently, it was reasonable that the Bank would consent to the Parsons' cross-collateralization provision in return for the Parsons agreeing to extend their loans. For these reasons, the trial court did not err in concluding that the Bank intended to give the Parsons a first lien priority position.

Affirmed.