**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

HEAVY PETROLEUM PARTNERS,
LLC; CHEROKEE WELLS, LLC,

     Plaintiffs-Counter-Defendants-
     Appellees,

v.

PAUL ATKINS; J.J.R. OF KANSAS
LIMITED,

     Defendants-Counter-Claimants-
     Appellants.

No. 11-3017
(D.C. No. 6:09-CV-01077-EFM)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, Chief Judge, **BALDOCK** and **LUCERO**, Circuit Judges.
_____

Plaintiff Heavy Petroleum Partners (HPP) and Defendant J.J.R. of Kansas Limited

(J.J.R.) entered into a contract whereby HPP would develop and use steam injection to

increase production on an oil lease owned by J.J.R. Under the terms of the contract,

J.J.R. would assign HPP a 75% working interest in the lease if HPP were able to produce

oil on the lease in commercial quantities. Before HPP reached a point of commercial

production, however, J.J.R. executed an unconditional assignment of the 75% interest to

HPP. Thereafter, Defendant Paul Atkins, who is the owner of Defendant J.J.R., took

_____
[*] This order and judgment is not binding precedent except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

actions inconsistent with HPP's 75% ownership interest, including "shutting in" the oil wells on the lease. Plaintiff Cherokee Wells is the current operator of the lease. Plaintiffs filed suit against Atkins and J.J.R., and Defendants counterclaimed. The district court granted Plaintiffs' motion for partial summary judgment and denied Defendants' motion for leave to file an amended counterclaim. The court then submitted the remaining issues to a jury, which found Defendants had breached the contract and awarded damages. Defendants appealed. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part, vacate in part, and remand.

I.

Defendant J.J.R. acquired an oil and gas lease on property located in Jefferson County, Kansas. On May 19, 2006, J.J.R. and HPP entered into a farmout agreement under which HPP would form a test pod and "commence actual operations for the drilling of new wells and the reworking of existing wells . . . to inject steam into the McClouth Sandstone for the purpose of producing oil in commercial quantities."[1] If HPP failed to commence operations on the lease, the farmout would terminate without penalty. But if HPP "timely and properly" completed the test pod, developed "a facility capable of producing oil in commercial quantities," and complied with the farmout's other terms, then J.J.R. would "assign to [HPP], subject to the reservations and conditions contained herein, a 75% Working Interest" in the oil lease. The farmout gave Plaintiffs the right to

---

[1] "Farmout Agreements are common agreements in the oil and gas business by which the owner of a lease agrees to assign an interest in the lease to another if it drills a well on the lease." Shell Rocky Mountain Prod., LLC v. Ultra Res., Inc., 415 F.3d 1158, 1160 n.1 (10th Cir. 2005).

- 2 -

develop additional 2.5-acre pods if it did not allow more than 180 days to elapse between "the completion of one Pod and the commencement of operations on the next Pod." Under paragraph 9 of the farmout, if Plaintiffs ceased to drill and develop additional pods, the lease on all undeveloped pods "shall be reassigned" to Defendant J.J.R.

The farmout provided that if HPP "violate[d] or fail[ed] to comply with any of the terms and provisions of this agreement," J.J.R. would give HPP written notice of the violation by certified mail. HPP would then have thirty days in which to correct the violation. "Failure of [HPP] to come into compliance with said agreement will result in the termination of said agreement in its entirety with all rights and interest in the Contract Area reverting to [J.J.R.]." (Appellants' App. at 63.) In the event of an uncured breach, HPP would then reassign its interest in the lease to J.J.R. within 30 days of the farmout's termination.

Plaintiffs allege the farmout agreement "included an A.A.P.L. Form 610-1989 Model Form Operating Agreement, often referred to as a joint operating agreement (JOA)." (Am. Compl. at ¶ 15.) Both "Heavy Petroleum Partners, LLC" and "JJR of Kansas" were typed into the attestation page of the JOA, but the parties' representatives did not actually sign the attestation page. (Appellants' App. at 87.) The JOA designated Blue Jay Operating, LLC, as the operator of the lease, but Blue Jay Operating later assigned its interest as operator to Plaintiff Cherokee Wells. The JOA provided that J.J.R. would pay a share of the costs and expenses of developing further oil production on the lease, as well as a portion of the overhead once additional wells began operation. (Id. at 89, 93.) The JOA contained a provision granting attorney's fees and costs to the

prevailing party in any suit to enforce a party's financial obligations under the JOA. The

parties orally agreed that Defendant Atkins would oversee some operations on the lease.

HPP proceeded to develop a test pod capable of "producing in paying quantities"

by August 2006, but steam injection did not commence until October 2006, when the

Kansas Corporation Commission approved a steam injection permit. Nevertheless, on

August 23, 2006, J.J.R. executed an assignment to HPP of 75% of the working interest in

the lease. The assignment had an effective date of May 19, 2006, the same day the

farmout was executed. J.J.R. made this assignment even though HPP had not yet fully

complied with the farmout by commencing steam operation.[2] The assignment made no

reference to the farmout or the conditions therein.

In early January 2009, Plaintiffs noticed diminished oil sales from the lease from

the prior month and directed Defendant Atkins to increase production. Atkins appeared

to correct the deficiency, and sold 300 barrels of oil from the lease in January 2009. On

January 26, 2009, however, Atkins filed an affidavit of non-production in the county

records in which he stated "there is at present no production of oil or gas in commercial

quantities at this time and secondary recovery attempts have failed. Assignment and

farmout agreement authorizing said assignment has expired by its own terms." A few

days later, Atkins filed a "Request of Change of Operator" with the Kansas Corporation

Commission designating J.J.R. as the operator of the lease. He did so despite the JOA's

---

[2] In the district court, Defendants explained this surprising move as resulting from "pressure" from Plaintiffs, who needed an assignment in order to receive payment for the oil they sold. (Appellants' App. at 146.) Defendants did not support this assertion by reference to any evidence, however.

- 4 -

provision that the operator "may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest" in the lease. The Commission approved the change of operator request. Atkins then informed the crude oil buyer that J.J.R. was now the operator, and the buyer changed its records to reflect this information.

In March 2009, HPP noticed the lack of oil sales from the lease in the prior month. HPP personnel subsequently discovered the wells on the lease had been shut in and steam injection had stopped. HPP personnel spoke with Atkins, who admitted he had shut in the wells and turned off the steam.[3] He said he could not afford his share of the operating costs because Plaintiffs were running up costs to put him out of business.

## II.

Plaintiffs then filed this diversity action under 28 U.S.C. § 1332 against Defendants, asserting various state law tort and contract claims. They also sought a temporary restraining order (TRO) and preliminary injunction prohibiting Defendants from interfering with operations on the lease. In order to avoid the expense of a hearing on the TRO and preliminary injunction, the parties entered into a "standstill agreement" in which Defendants agreed not to interfere with the operations of the lease pending

---

[3] Defendants' disputed this fact in their answer to the First Amended Complaint. In their answer to the original Complaint, however, they said "defendant Atkins admits that he spoke to HPP personnel and admitted that he had shut the wells since there was no one to operate the Lease. Further, it is admitted the steam generators had been turned off, but that was at the direction of plaintiffs." A statement in a legal pleading is an admission binding on a party. Rooms v. S.E.C., 444 F.3d 1208, 1213 (10th Cir. 2006).

- 5 -

resolution of the litigation.[4]  Defendants counterclaimed against Plaintiffs for conversion and quiet title, alleging Plaintiffs breached the farmout agreement by ceasing to drill and develop further pods.  Plaintiffs subsequently filed an amended complaint asserting causes of action for (I) breach of contract, (II) quiet title, (III) "breach of contract— unpaid joint interest billing," (IV) "breach of contract—unpaid overhead," (V) "breach of contract—failure to offer other leases/acreage," (VI) "breach of contract—standstill agreement," and (VII) declaratory judgment.  Plaintiffs moved for partial summary judgment, seeking summary judgment as to counts I, II, III, IV, and parts of count VII, as well as to all of Defendants's counterclaim.[5]  Defendants filed a response and at the same time sought leave to file an amended counterclaim.  The district court denied Defendants' motion for leave to file an amended counterclaim, concluding the amendment would be futile because the claims would be subject to dismissal.

Thereafter, the district court granted Plaintiffs' motion for partial summary judgment, and held the following: (1) Plaintiff HPP was the owner of an unconditional 75% interest in the lease (2) Plaintiff Cherokee Wells had the exclusive right to operate the lease, and Defendants had no right to "operate, manipulate, or otherwise control equipment" on the lease, (3) Defendants had no right to interfere with Cherokee Wells' operation of the lease, (4) Cherokee Wells had the right to collect from Defendant J.J.R. the share of overhead attributable to J.J.R.'s working interest in the lease, and (5)

---

[4] Defendants allegedly violated this agreement, and the district court later entered a preliminary injunction prohibiting Defendants from interfering with the lease.

[5] Plaintiffs later abandoned counts V and VII, and stipulated to this effect in the pretrial order.

Defendants were permanently enjoined from operating or manipulating any machinery located on the lease property and from taking any action to interfere with Plaintiffs' production on the lease property. The district court then submitted the remaining narrow questions to the jury: whether Defendants breached their duty to pay amounts owed under the JOA, and if so, what damages were appropriate. The district court also submitted the amount of "litigation expenses," including attorney's fees, to the jury. The jury found Defendants failed to pay their share of oil production expenses under the JOA and awarded Plaintiffs $52,012.03 for "Unpaid Joint Interest Billing," $35,375 for "Unpaid Overhead," and $155,239.36 for "Litigation Expenses." Pursuant to the jury verdict, the court entered judgment against Defendants for $242,626.39 in damages.

## III.

Defendants attempt to raise five issues on appeal, although they have waived a number of them. First, they argue Defendant Atkins is not personally liable on the farmout agreement or the JOA because he was not a party to those agreements. Second, Defendants argue the JOA was not a valid contract because it was not attached to the farmout or signed in compliance with the statute of frauds. Third, Defendants contend the district court abused its discretion in denying leave to file an amended counterclaim. Fourth, they argue the district court erred in quieting title to the lease in Plaintiffs. Fifth, Defendants argue the district court erred in awarding Plaintiffs attorney's fees and costs.

## A.

Defendants first argue Defendant Atkins is not personally liable on the farmout agreement or JOA. In Count I of the First Amended Complaint, Plaintiffs asserted,

"Defendants' actions in shutting in the wells, attempting to change the operatorship with the [Kansas Corporation Commission], and attempting to change the operatorship and/or the division of interest recognized by the crude oil purchaser breached the Farmout and the JOA . . . ." Count II merely sought to quiet title, not to impose liability on Defendants. Counts III and IV did not allege action by "defendants," but only by J.J.R. Plaintiffs abandoned Counts V and VI, and Count VII requested a declaratory judgment of Plaintiffs' rights vis-à-vis J.J.R. without mentioning Defendant Atkins. Thus, only Count I alleged Atkins' individual liability on the contract. Plaintiffs did not make clear whether they were seeking money damages on Count I or simply injunctive relief. Under Count I, the First Amended Complaint said, "[Plaintiffs] have suffered, and will continue to suffer, damages from this breach in the form of lost production and additional operating expenses . . . . Damages from this breach are difficult to determine, and [Plaintiffs] have no adequate remedy at law." In their prayer for relief, Plaintiffs requested "actual damages," without specifying on which counts.

Although Plaintiffs argued in their brief that Atkins was personally liable on the contract, they reversed course at oral argument and conceded Atkins was *not* personally liable for damages. At our request, Plaintiffs clarified their position in a letter submitted after oral argument. Plaintiffs now concede,

> [T]he trial court's amended judgment was in error to the extent, and only to the extent, that it awarded money damages against defendant/appellant Paul Atkins individually. The trial court's judgment was correct, and should be affirmed, in all other respects, including . . . the declaratory and injunctive relief provided against Paul Atkins . . . .

(Letter of John W. Broomes to the Clerk of Court, Nov. 28, 2011.) Because Plaintiffs

- 8 -

concede the point, we need not consider whether the district court actually erred.[6] On remand, the district court should vacate the damages award against Defendant Atkins. See U.S. ex rel. Moody v. Am. Ins. Co., 835 F.2d 745, 749 (10th Cir. 1987).

B.

Defendants next argue the JOA is not a valid and binding contract. "We review a district court's grant of summary judgment de novo, applying the same standard as the district court." Helm v. Kansas, 656 F.3d 1277, 1284 (10th Cir. 2011). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Bowling v. Rector, 584 F.3d 956, 963–64 (10th Cir. 2009) (internal quotations omitted). Defendants argue the JOA is not binding because it was neither signed nor attached to the farmout agreement. Defendants have waived any challenge to the JOA's validity a number of times. First, Defendants admitted in their answer the truth of Plaintiffs' allegation that the JOA was included with the farmout agreement. (Answer to Am. Compl. at ¶ 3.) "A pleading prepared by an attorney is an admission . . . because the attorney presumably speaks for the litigant." Rooms v. S.E.C., 444 F.3d 1208, 1213 (10th Cir. 2006). Second, the parties stipulated in the pretrial order that "[t]he Farmout included A.A.P.L. Form 610-1989 Model Form

---

[6] The only potential "error" by the district court we can discern is the court's assumption that Plaintiffs' Complaint sought money damages against Defendant Atkins. But this would have been at least a plausible assumption based on the Complaint's ambiguity and the fact that neither party challenged this reading of the Complaint. Thus, the district court's judgment may not have been "in error." Plaintiff's concession of error, however, is sufficient to relieve Atkins of personal liability.

- 9 -

Operating Agreement, often referred to as a joint operating agreement (JOA)." (Pretrial Order at 3.) Moreover, the pretrial order reflects that Defendants requested "Attorney fees and litigation costs expressly recoverable pursuant to JOA." (Appellees' Supplemental App. at 159.) Our law is clear that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived . . . ." Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002). Finally, Defendants failed to raise any objection to the JOA in the district court. "Absent extraordinary circumstances, we will not consider arguments raised for the first time on appeal." Turner v. Pub. Serv. Co. of Colo., 563 F.3d 1136, 1143 (10th Cir. 2009).

Defendants also argue "there was an insufficient finding of evidence of a joint venture to support the validity of the unsigned JOA . . . ." Defendants further contend they "would be privileged under Kansas statute to remove themselves and cease to participate in the joint venture that would have existed if the plaintiff's [sic] joint operating agreement was executed by either." This argument is misdirected; joint venture principles are simply inapplicable. The district court found Defendants liable based on contractual liability, not based on a finding of a joint venture or partnership.

Defendants also challenge the JOA based on its failure to comply with the statute of frauds. Defendants have waived this objection as well because they failed to raise it prior to this appeal. "Failure to plead an affirmative defense results in a waiver of that defense." Bentley v. Cleveland Cnty. Bd of Cnty. Comm'rs, 41 F.3d 600, 604 (10th Cir. 1994). Federal Rule of Civil Procedure 8(c) specifically lists the statute of frauds as a waivable defense, and thus Defendants cannot raise the statute of frauds at this late

juncture.  The district court correctly determined the JOA to be a binding contract.

C.

Defendants next argue the district court erred in denying them leave to file an amended counterclaim.  We generally review the district court's denial of leave to amend a counterclaim for abuse of discretion.  Manning v. United States, 146 F.3d 808, 812 (10th Cir. 1998).  Leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), but a district court may deny leave to amend if the amendment would be futile.  U.S. ex. rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161, 1166 (10th Cir. 2009) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  "[W]hen denial is based on a determination that amendment would be futile, our review for abuse of discretion includes de novo review of the legal basis for the finding of futility."  Miller ex. rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs., 565 F.3d 1232, 1249 (10th Cir. 2009). Defendants sought to add counterclaims for (1) negligence, (2) fraud, (3) "intentionally fraudulent actions" giving rise to punitive damages, and (4) intentional infliction of emotional distress.  The district court held that all four claims would be futile.   The negligence claim would fail because it was barred by the JOA and because the contract specifically required the allegedly negligent actions.  The court said the second and third claims were "conclusory" and not pleaded with the particularity required by Fed. R. Civ. P. 9(b).  Finally, the fourth claim failed the pleading requirements set forth in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).

The district court properly denied leave to amend.  Defendants' first counterclaim asserted that "plaintiffs have negligently damaged production capabilities of the oil

- 11 -

bearing formation on the lease by injecting water and steam into the formation without conducting reasonable and proper research and investigation into the effects of the water and steam on the . . . oil bearing formation." The farmout agreement specifically *required* Plaintiffs to conduct steam injection in the test pod and, if it were successful, in additional pods. Thus, Plaintiffs had a contractual duty to conduct steam injection in the test pod, and the contract required no further "research and investigation." As the district court said, "defendants may not circumvent the terms of the contract by resorting to negligence allegations."[7] Under Kansas law, "[i]t is elemental that negligence does not operate in a vacuum. In order for negligence to be actionable, there must exist a duty owed to the plaintiff." Schmeck v. City of Shawnee, 651 P.2d 585, 605 (Kan. 1982). In this case, such a duty must arise apart from the contract. See Moore v. Muntzel, 642 P.2d 957, 960 (Kan. 1982) ("[T]he issue of negligence of defendant must involve violation of some duty arising independently of the contract."); Pancake House, Inc. v. Redmond ex rel. Redmond, 716 P.2d 575, 578 (Kan. 1986) ("A tort . . . is a violation of a duty imposed by law, a wrong independent of contract."). Defendants have not alleged that Plaintiffs had any statutory or common law duty to conduct steam injection in a way that did not damage the oil-bearing formation. And if Plaintiffs violated their *contractual* duties, Defendants must sue in contract, rather than in tort. Thus, Defendants' first counterclaim would have been futile.

---

[7] Additionally, the JOA provided that the "operator" would have no liability except for injuries resulting from "gross negligence or willful misconduct." This protection would extend to the Cherokee Wells, who is designated as the operator under the JOA. The protection would not, as the district court suggests, apply to Plaintiff HPP, because HPP is not the operator of the lease.

Defendants' second and third counterclaims fare no better. Rule 9(b) requires parties asserting fraud to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The complaint must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir. 1997) (quoting Lawrence Nat'l Bank v. Edmonds, 924 F.2d 176, 180 (10th Cir. 1991). Here, the entirety of Defendants' second counterclaim reads:

> Defendants have been damaged by their reliance upon the false, fraudulent, intentionally misleading statements and representations of partners, employees and agents of plaintiffs when defendants detrimentally relied on the statements that plaintiff Heavy Petroleum Partners, L.L.C. was skilled, experienced and qualified to conduct heavy petroleum extraction on defendants' lease with the use of secondary recovery steam injection technology. This fraud resulted in damages to defendants due to their detrimental reliance.

(Def.'s First Amended Counterclaim ¶ 8.) These allegations list the basic elements of fraud and allege some facts, but they do not indicate the time or place of the alleged misstatements. Such conclusory allegations do not meet the heightened pleading standard of "particularity." Fed. R. Civ. P. 9(b). Defendants' third proposed claim, for "intentionally fraudulent actions," is probably not even a separate counterclaim. It reads, "Defendants request punitive damages based on the intentionally fraudulent actions of plaintiff." (Id. ¶ 9.) This is most likely simply a prayer for punitive damages, but if it were construed as a separate fraud claim, it too would fail for lack of particularity. Therefore, Defendants' second and third proposed counterclaims would have been subject to dismissal under Fed. R. Civ. P. 12(b)(6).

- 13 -

Defendants' fourth counterclaim for intentional infliction of emotional distress was also futile. In order to survive a motion to dismiss, a pleading under Rule 8(a) "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 129 S. Ct. at 1949 (quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Defendants' counterclaim states:

> Paul Atkins requests that he be awarded monetary compensation for damages suffered due to the intentional infliction of emotional distress by plaintiffs in their intentionally abusive treatment and cruel and unwarranted financial dealings with Paul Atkins, resulting in his inability to enjoy his family, home, and life.

(Def.'s First Amended Counterclaim ¶ 10.) This claim is devoid of any specific facts that would support a plausible claim for relief. Iqbal, 129 S. Ct. at 1949. It merely alleges "intentionally abusive treatment" and "cruel and unwarranted financial dealings," but does not support these allegations with any concrete facts. Because the proposed amended counterclaim would have been futile, the district court did not abuse its discretion in denying Defendants leave to file the counterclaim.

D.

Next, Defendants argue the district court erred in quieting title in Plaintiffs because, according to Defendants, title to the lease reverted back to J.J.R. when Plaintiffs breached the farmout agreement.[8] We review the district court's grant of summary

---

[8] Defendants do not enlighten us on *how* Plaintiffs breached the farmout agreement. Defendants assigned a 75% interest in the lease to Plaintiffs before Plaintiffs had fulfilled all the conditions in the farmout. But Plaintiff HPP's mere acceptance of an early and unearned assignment cannot constitute a breach of the farmout. Defendants

- 14 -

judgment on the quiet title issue de novo. <u>Helm</u>, 656 F.3d at 1284. In a diversity action, we apply the substantive law of the forum state, which here is Kansas. <u>Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co.</u>, 636 F.3d 1300, 1302 (10th Cir. 2011). Under Kansas law, "[t]he primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction." <u>Carrothers Constr. Co. v. City of S. Hutchinson</u>, 207 P.3d 231, 239 (Kan. 2009). Absent any ambiguity, Kansas courts "must give effect to the intent of the parties as expressed within the four corners of the instrument." <u>Blair Constr., Inc. v. McBeth</u>, 44 P.3d 1244, 1252–53 (Kan. 2002). Here, the district court interpreted the August 2006 assignment as unambiguous, because it did not refer to the farmout agreement or JOA. The district court therefore concluded the assignment was not conditioned on the farmout or JOA, and quieted title to a 75% working interest in the lease to Plaintiffs.

The district court, however, failed to consider an important rule of Kansas contract interpretation which neither party has raised. Under Kansas law, "[d]ocuments which are executed at different times, but in the course of the same transaction concerning the same subject matter, will be construed together to determine the intent of the parties to the

also argued that we should abstain from this case under <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315, 327 (1943), because Plaintiffs allegedly conducted steam injection without a proper state permit. This argument is utterly frivolous. <u>Burford</u> "is concerned with protecting complex state administrative processes from undue federal interference." <u>New Orleans Pub. Serv., Inc. v. Council of New Orleans</u>, 491 U.S. 350, 362 (1989). To resolve this case, neither we nor the district court need to interfere with state administrative processes, complex or otherwise. At most, we need to determine whether the allegedly unauthorized steam injection constituted a breach of the farmout agreement.

contract." Hollenbeck v. Household Bank, 829 P.2d 903, 906 (Kan. 1992).  This rule applies to contracts executed in the course of the same transaction even if "they do not in terms refer to each other."  West v. Prairie State Bank, 436 P.2d 402, 405 (Kan. 1968).  Additionally, this rule applies even if the contract being interpreted is unambiguous.  See Schnug v. Schnug, 454 P.2d 474, 477–78 (Kan. 1969) (construing two documents together even after finding them both unambiguous); Harder v. Wagler, 838 P.2d 366, 408 (Kan. Ct. App. 1992) (applying the rule despite a party's contention that two documents were unambiguous if interpreted separately).

## 1.

The August 2006 assignment clearly "concerns the same subject matter" as the farmout agreement and JOA, because it concerns the same lease.  The more difficult question is whether it was executed "in the course of the same transaction."  The Kansas courts have not discussed this element in much depth, but their decisions provide some insight.  The earliest Kansas case to articulate this rule was Jordon v. Clark, 121 P. 345 (Kan. 1912).  There, a married couple executed a separation agreement in which each released the other from "all claims . . . now or hereafter" on a quarter section of land they jointly owned.  Id. at 345.  On the same day, the couple conveyed to each other by warranty deed separate halves of the jointly owned property.  Id.  These deeds contained clauses barring the grantor and his or her heirs and assigns from any claim or inheritance to the land.  Id.  The Kansas Supreme Court was faced with the question of whether the separation agreement renounced the wife's right to inherit her husband's half of the property.  The court determined the warranty deeds should be construed along with the

separation agreement, and all three "should be regarded as a single contract." Id. at 346. The court said,

> The presumption is that different writings made by the same parties, on the same day, relating to the same subject-matter, and in the course of the same transaction, should be read together and construed as a single contract. *Especially should they be regarded as parts of one transaction, where, as here, they refer to each other.*

Id. (emphasis added). The court concluded, based on the language in the warranty deeds, that the wife had disclaimed her inheritance rights in her husband's portion of the property.

The Kansas courts later abandoned Jordon's requirement that the documents be executed "on the same day," and substituted the words "at or near the same time." Dearborn Motors Credit Corp. v. Neel, 337 P.2d 992, 1001 (Kan. 1959). From there, the rule evolved into its modern iteration—documents will be construed together if executed by the same parties "contemporaneously or even at different times in the course of the same transaction" as long as they "concern the same subject matter." In re Cooper's Estate, 403 P.2d 984, 988 (Kan. 1965). Unlike this case, however, most Kansas cases have involved documents that were executed within hours or days of each other, making the "same transaction" element more easily satisfied.

At least one Kansas case, however, has construed together documents that were executed years apart. In Parsons v. Biscayne Valley Investors Ltd., 935 P.2d 218, 220 (Kan. Ct. App. 1997), the Kansas Court of Appeals considered a case in which plaintiffs loaned money to an apartment complex developer in exchange for two promissory notes secured by two mortgages. A bank held a second mortgage on each apartment complex.

- 17 -

Id. Ten years after executing the mortgages, the parties modified the two mortgages with the bank's consent. Id. The plaintiffs argued the modification gave their mortgages priority over the bank's mortgages. The Kansas Court of Appeals determined the plaintiffs' mortgages, the bank's mortgage, and the modification agreement should "be construed together." Id. at 222. The court quoted Hollenbeck's rule that documents "executed at different times, but in the course of the same transaction concerning the same subject matter" were construed together. Id. (citing Hollenbeck, 829 P.2d at 906). The court noted the modification agreement referred to all three mortgages and "the documents concern the same subject matter." Id. "Therefore, it is appropriate to construe all of the instruments together." Id. Parsons is significant because the documents which were construed together were executed ten years apart. Yet the court still determined, at least impliedly, that they related to the same transaction.[9]

---

[9] The Kansas Supreme Court appeared to reach the same result in Federal Land Bank of Wichita v. Krug, 856 P.2d 111, 113 (Kan. 1993), but its opinion is not entirely clear. In Krug, the original borrowers purchased land with a loan secured by a mortgage in favor of the Federal Land Bank. Three years later, the borrowers sold the land to S & S Ranch, which signed a separate agreement assuming the mortgage. S & S later stopped making payments on the mortgage because it never received a deed. The Kansas district court rescinded the land sale contract between the borrowers and S & S, but held both the borrowers and S & S were liable to the Bank. The Kansas Court of Appeals reversed, holding that the mortgage assumption agreement was also rescinded because it was unsupported by consideration. The Kansas Supreme Court reversed again, saying the question on appeal was whether rescinding the land sale contract also rescinded the assumption agreement. The court said,

> An assumption agreement is an act of assuming or taking an obligation on one's self and can include the undertaking or adoption of a debt or obligation resting upon another. When one contracts to assume a mortgage even though the documents are executed at different times, but in the course of the same transaction concerning the same subject matter, they will be

In Giefer v. Swenton, 928 P.2d 906, 911 (Kan. Ct. App. 1996), by contrast, the Kansas Court of Appeals did *not* construe two documents together where they were intended to take effect at different times. In Giefer, "the trial court attempted to construe a deed, which was intended to take effect immediately, along with two unprobated wills executed by decedent." Id. The court of appeals "consider[ed] this to be mixing apples with oranges" because a will does not take effect until the testator dies and the will is admitted to probate. Id. The court said, "These documents are so divergent that we believe they should not be construed together." Id.

2.

Based on the foregoing authority, we conclude the documents in this case are part of the "same transaction." Black's Law Dictionary defines "transaction" as "[t]he act or an instance of conducting business or other dealings" and "[s]omething performed or carried out; a business agreement or exchange." Black's Law Dictionary 1635 (9th ed. 2009). Even though the assignment was executed three months after the farmout, it related to the same "business agreement or exchange" as the farmout—Plaintiff's right to a 75% interest in the lease in exchange for developing steam injection. The assignment

construed together to determine the intent of the parties to the contract.

Id. at 115 (citing Hollenbeck, 829 P.2d at 903). A cursory reading suggests the court was construing the mortgage assumption agreement together with the original mortgage. Yet the court *actually* was construing the mortgage with the *land sale contract*. The court went on to say the land sale contract was conditioned on "the approval of the Bank and the buyer's assumption of the note and mortgage. Under these circumstances, the Bank's approval was sufficient consideration for the assumption agreement." Id. Thus, despite wording suggesting otherwise, the Kansas Supreme Court has not construed documents executed three years apart as being "in the course of the same transaction."

- 19 -

would have made no sense if it were not part of the exchange set forth in the farmout agreement. Furthermore, the court in Jordon said documents are particularly likely to be part of the "same transaction" if they refer to each other. Jordon, 121 P. at 346. Here, the farmout referred to the assignment, or at least contemplated it. Specifically, the farmout said that if HPP developed a successful test pod and "complied with all of the terms and conditions contained herein," then J.J.R. would "assign to [HPP], subject to the reservations and conditions contained herein, a 75% Working Interest" in the lease. Finally, the assignment was dated to take effect the same day as the farmout, May 19, 2006, even though it was executed three months later. This date indicates the parties' intent to treat the assignment as part of the May 19, 2006, transaction.

Accordingly, we vacate the district court's judgment quieting title in Plaintiffs and remand for the district court to consider whether, reading the assignment and the farmout agreement together, Plaintiffs are entitled to a 75% working interest in the lease. We leave that determination to the district court because it presents a multitude of questions that are neither adequately briefed nor addressed by the record on appeal. Under paragraph 15 of the farmout, Defendants were not entitled to reassignment of a 75% working interest in the lease unless (1) Plaintiffs breached the farmout, (2) Defendants gave Plaintiffs notice of the breach by certified mail, and (3) Plaintiffs failed to cure the breach within thirty days. Defendants have failed to assert any breaches of the farmout in their briefs before this court, even though such a breach is essential to their argument. They did perfunctorily reference seven alleged breaches in the district court in response to the motion for partial summary judgment. But these "breaches" are so tied up in the

- 20 -

facts of this case that we are loathe to address them as a matter of law. Defendants have also made many inconsistent and confusing assertions and denials in the course of this litigation, making it difficult to determine what assertions we should credit or reject.

Because the district court is better equipped to determine whether fact issues remain, we leave it to the district court to decide whether summary judgment is appropriate when the assignment is read in conjunction with the farmout. In determining whether Plaintiffs are entitled to an interest in the lease, the district court may need to consider such questions as (1) whether assignment of the lease was conditioned on the test pod producing commercial quantities using steam injection, or simply conventional methods, (2) whether Defendants waived any conditions in the farmout agreement, (3) whether Plaintiffs failed to "commence operations," and, if so, whether the lease terminated automatically, (4) whether Defendants provided Plaintiffs proper notice regarding any actual breaches, (5) whether any fact issues remain, and (6) whether, in light of paragraph 9 of the farmout, Plaintiffs are entitled to any interest in the lease beyond the first two pods. We express no view on how these questions are to be resolved and whether the quiet title remedy is appropriate. We leave that determination to the district court.

E.

Defendants' final contention is that the district court "abused its discretion by granting arrearages, fees and costs to be paid to Plaintiff[s] without documentation and a stated contractual right in the executed agreement." We first address Defendants' contention that the attorney's fees were not authorized by contract. Under Kansas law, a

- 21 -

prevailing party may recover attorney's fees if such fees are "specifically authorized by statute or agreement." T.S.I. Holdings, Inc. v. Jenkins, 924 P.2d 1239, 1254 (Kan. 1996). Here, the JOA contained the following provision:

> Costs and Attorney's Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and reasonable attorney's fees which the lien provided for herein shall also secure.

(Appellants' App. at 82.) Defendants' only response to this provision is to argue the JOA is not a binding contract, an argument the district court properly rejected.[10] The provision unambiguously authorized attorney's fees to the prevailing in suits arising out of financial obligations imposed by the JOA. Because we vacate the district court's decision on the quiet title issue, however, we must also vacate the award of attorney's fees. Until the district court resolves the quiet title question, Plaintiffs cannot be a "prevailing party" entitled to attorney's fees.

We next address the manner in which fees were awarded. Ordinarily, we review a district court's decision whether to award attorney's fees for abuse of discretion and its application of the legal principles underlying that decision de novo. Pound v. Airosol Co., 498 F.3d 1089, 1100 (10th Cir. 2007). This is not an ordinary case, however, because the district court did not award attorney's fees, but rather submitted the issue and the amount of attorney's fees to the jury. Thus, Defendants' argument is misdirected; the

---

[10] Defendants' challenge to both the JOA and the recovery of attorney's fees at this stage is disingenuous given that Defendants themselves sought to recover "Attorney fees and litigation costs expressly recoverable pursuant to JOA." (Appellees' Supplemental App. at 159.)

district court did not "grant" attorney's fees. Defendants have not challenged the jury's damages award that included $155,239.36 in "litigation expenses." Nor have Defendants argued that the district court erred in submitting attorney's fees to the jury.

Nevertheless, the procedure by which the district court awarded attorney's fees was improper. Federal Rule of Civil Procedure 54(d)(2)(A) instructs, "A claim for attorney's fees . . . must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." We apply the substantive law of Kansas, Cohen-Esrey, 636 F.3d at 1302, and Kansas law does not require attorney's fees to be proved as an element of damages. In fact, under Kanas law, "ordinarily . . . the court, sitting without a jury, makes an allowance of attorney's fees." Thomas v. Kansas City S. Ry. Co., 421 P.2d 51, 57 (Kan. 1966). This is because "a claim for attorney's fees is not part of the merits of the action to which the fees pertain." Snodgrass v. State Farm Mut. Auto. Ins. Co., 789 P.2d 211, 214 (Kan. 1990) (quoting Budinich v. Becton Dickinson & Co., 486 U.S. 196, 200 (1988)). Although we have recognized a right to a jury for a claim "for attorneys' fees already incurred in a separate, underlying action against a third party," J.R. Simplot v. Chevron Pipeline Co., 563 F.3d 1102, 1117 (10th Cir. 2009), we have never held that Rule 54(d)(2)(A)'s exception applies to contracts such as the JOA in this case, which authorize attorney's fees for the prevailing party in the same lawsuit. The Seventh Circuit has concluded that the exception is inapplicable to such cases. Rissman v. Rissman, 229 F.3d 586, 588 (7th Cir. 2000). In Rissman, the Seventh Circuit said,

What Rule 54(d)(2)(A) requires is that a party seeking legal fees among the

- 23 -

items of damages—for example, fees that were incurred by the plaintiff before the litigation begins, as often happens in insurance, defamation, and malicious prosecution cases—must raise its claim in time for submission to the trier of fact, which means before the trial rather than after. *Fees for work done during the case should be sought after decision*, when the prevailing party has been identified and it is possible to quantify the award.

Id. at 588 (emphasis added). Because the fee agreement in this case did not fit Rule 54(d)(2)(A)'s exception, the fees should have been requested pursuant to Rule 54(d) rather than submitted to a jury. On remand, the prevailing party may seek an award of costs and attorney's fees pursuant to Rule 54(d).

We AFFIRM the district court's denial of leave for Defendants to file an amended counterclaim and its ruling that the JOA is a valid and binding contract; we VACATE the grant of quiet title, the grant of summary judgment, the jury verdict, and the award of attorney's fees; and REMAND for further proceedings.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge