NOT DESIGNATED FOR PUBLICATION

No. 112,097

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

NORTH AMERICAN SAVINGS BANK,
*Appellee/Cross Appellant*,

v.

DOUGLAS O. VOLKLAND, *et al*.,
*Appellants/Cross Appellees*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS M. SUTHERLAND, judge. Opinion filed October 2, 2015. Affirmed in part, reversed in part, and remanded with directions.

*Kevin J. Odrowski*, of Kansas City, Missouri, for appellants/cross appellees.

*Thomas M. Franklin*, of The Franklin Law Firm, of Kansas City, Missouri, for appellee/cross appellant.

Before PIERRON, P.J., MCANANY, J., and BURGESS, S.J.

*Per Curiam*: Douglas O. Volkland and Janet Swinson, husband and wife, signed two promissory notes with North American Savings Bank (NASB), secured by two mortgages on three properties in Johnson County, Kansas. Douglas' father, E. Keith Volkland, guaranteed the notes. NASB determined Keith's death in May 2012 triggered a default on the notes. Attempts to modify the notes and cure the alleged default were unsuccessful and Douglas and Janet stopped paying on both notes. The second note matured and Douglas and Janet still failed to pay. NASB made a formal demand request, which went unanswered. NASB then filed a foreclosure action. The district court allowed

1

NASB to foreclose and awarded NASB attorney fees. The court declined to refuse to foreclose and provide equitable relief to Douglas and Janet. The court also modified the money judgment entered against Douglas and Janet to include additional interest through the trial after this appeal had been docketed.

Douglas and Janet appealed, citing numerous alleged errors in the district court's decisions. NASB cross-appealed, citing additional errors. We affirm the district court's decision determining NASB was entitled to foreclose on the mortgages.

On March 2, 2004, Douglas and Janet executed their first promissory note (Note 1) for $590,000 payable to NASB. Note 1 was to mature on April 1, 2034. It indicated it was governed by the laws of Missouri. Note 1 identified the following as "Loan Documents" that secured the note: "A Kansas Future Advance Mortgage; . . . Guaranty Agreements from E. Keith Volkland." Note 1 indicated it was to be used "solely for business purposes." Upon the occurrence of a default, the interest rate automatically adjusted to the default rate.

Note 1 also included the following provision:

"Maker . . . shall pay to Lender all . . . attorneys' fees incurred by Lender in connection with the making, origination or administration of the loan or indebtedness evidenced hereby or in collecting, enforcing or protecting this Note or any other Loan Document, whether incurred in or out of court, including probate proceedings, appeal, and bankruptcy proceedings.

Note 1 indicated multiple events which constituted a default. The following are relevant to this appeal:

"Each of the following events or occurrences shall constitute an 'Event of Default' hereunder: (a) *if default is made* in the payment of any installment hereunder, or of any

2

monetary amount payable hereunder, *under the terms of any Loan Document*, or under the terms of any other obligation of Maker to Lender, when the same is due; . . . [or] (c) *if any person liable hereon, . . . shall die . . . .*" (Emphasis added.)

So, under Note 1, a default on the accompanying mortgage was considered a default under Note 1.

Note 1 provided that upon an occurrence of default NASB, "may declare the entire balance of this Note, all accrued interest, costs, expenses, charges, disbursements and fees payable by [Douglas and Janet] hereunder or under any other Loan Document and any other indebtedness evidenced hereby to be immediately due and payable . . ."

On March 2, 2004, Douglas and Janet also signed a mortgage (Mortgage 1) with NASB. The mortgage covered three tracts of land:

"TRACT I: Beginning at a point 1340.61 feet South of the Northwest corner of the Northeast Quarter of Section 24, Township 13 South, Range 22 East; thence Southerly 670.31 feet along the West line of said Quarter Section; thence Easterly 2622.05 feet along a line parallel to the north line of said Quarter Section; thence Northerly 302 feet along the East line of said Quarter Section; thence Westerly 237.0 feet along a line parallel to the North line of said Quarter Section; thence Southerly 55.0 feet along a line parallel to the East line of said Quarter Section; thence Westerly 863.0 feet along a line parallel to the North line of said Quarter Section; thence Northerly 415.0 feet on a line parallel to the East line of said Section to a point on the North line of the North one-half of the South one-half of said Section; thence Westerly 1515.82 feet to the Point of Beginning, except any part in streets or roads, Johnson County, Kansas.

"TRACT II: The south half of the south half of the northeast quarter of Section 24, Township 13, Range 22, Johnson County, Kansas, except any part in road. [collectively, the 'Moonlight Road Tracts'].

3

"Tract III: Lot 15, Block 3, Leawood Hills, a subdivision in the City of Leawood, Johnson County, Kansas."

Tract III was released after Douglas and Janet sold the property and made a principal pay down.

Mortgage 1 also provided multiple events of default, including the following: "The death of any Grantor or *Guarantor*". . . . (Emphasis added.)

Keith personally guaranteed Note 1 (Guaranty 1). The guaranty agreement provided that Keith "unconditionally guarantee[d] the payment and performance, upon demand, of all Obligations of Borrower to Lender." Keith was "cumulativel[y] and not alternativel[y]" liable for all indebtedness under the note. The guaranty also indicated it was governed by the laws of Missouri.

On January 9, 2006, Douglas and Janet executed a second promissory note (Note 2) for $155,000 payable to NASB. Note 2 originally matured on February 1, 2007. The parties agreed Note 2 included virtually identical events constituting a default. The parties also agreed to extend the maturity date on more than one occasion, and its final maturity date was October 1, 2012.

Douglas and Janet signed a second mortgage (Mortgage 2) with NASB. Mortgage 2 covered three tracts of land—the two Moonlight Road Tracts and "Tract III: Lot 425, Leawood Estates, a subdivision in the City of Leawood, Johnson County Kansas." (Belinder House). Mortgage 2 did not include a provision of default based upon anyone's death.

Keith also guaranteed Note 2 (Guaranty 2). It included the same relevant guaranties as the guaranty of Note 1.

4

On May 2, 2012, Keith died. On May 14, 2012, Douglas emailed Michael Braman to inform him of Keith's death.

Michael Braman is the chief planning officer for NASB. Braman was the servicing manager for Douglas' and Janet's loans. Braman primarily dealt with Douglas regarding their loans. After Keith's death, Douglas requested a "break" on "late charges and reporting." Braman accommodated Douglas's request.

Braman indicated NASB worked with Douglas and Janet for "a while following [Keith's] death because they were having difficulty in obtaining the funds necessary to make that payment." Douglas indicated he was struggling to find the paperwork necessary to access his father's funds, which he needed to make the payment since Douglas' and Janet's funds were insufficient.

On July 11, 2012, Douglas and Janet made a single payment for the May, June, and July payments owed on both notes. On August 10, 2012 and September 10, 2012, Douglas and Janet made respective monthly payments on both. The September payments were the last payment that Douglas and Janet paid to NASB.

On September 18, 2012, Braman sent notice to Douglas that they needed to work together to cure the default and requested more information about Keith's trust. Braman did not name Keith's death as the event constituting default. Though Douglas responded to some of Braman's questions about the trust, he never addressed the default or request to cure.

Braman and Douglas spoke a couple times over the next few weeks. The conversations were not documented, but their trial testimony reveals the two largely disagreed about the nature of what had transpired. Braman requested Douglas and Janet make a large pay down on Note 1 and pay off Note 2 upon maturity in order to prevent

5

foreclosure proceedings. Note 2 matured soon and NASB did not wish to extend Note 2 further. Braman could not recall specific details, but viewed the conversation as a "proposal"—an attempt at a modification to cure the default. In their brief, Douglas and Janet claim "Braman did not deny that the $400,000 payment was a demand on behalf of NASB to the borrowers." The statements they cited to support their claim that NASB did not deny the request was a demand are as follows:

> "Q: But there isn't any question that NASB's proposal to the Volklands in early September 2012 is . . . . Pay off [Note 2] and give us $260,000 by December in a restricted account, in addition to your real estate collateral. And if you will do that, we will not call your note; otherwise, we are going to foreclose.
> "A: I don't think I put it so bluntly, but we would have called the default.
> Q: Okay. And you did call a default and you filed to foreclosure promptly, didn't you?
> "A: We did.
> . . . .
> "Q: [Y]ou demanded this additional cash even though you had more than a million dollars' worth of real estate collateral?
> "A: I don't want to say how much real estate collateral we have . . .
> "Q: Okay. But you still made the demand for the extra money. . .
> "A: [I]t is the proposal that we made."

Douglas and Janet mischaracterize the back and forth communication between their attorney and Braman. Douglas' and Janet's attorney never asked Braman whether the request for a pay down was a demand. Braman's responses clearly indicate his perspective that he was trying to negotiate a modification in order to cure the default and prevent NASB from foreclosing, not making a formal demand.

Douglas viewed NASB's proposal as an improper demand and acceleration of the note, which constituted a breach.

Douglas testified he was "told that [NASB was] going to require a $400,000 paydown on [Note 1], and we were told that they weren't going to renew [Note 2.]" Douglas said he "had no other opportunity" to pay something less than $400,000 on Note 1. Douglas responded by refusing to pay Note 2 "[b]ecause it was apparent [NASB was] going to hold us in default on [Note 1.]"

On October 1, 2012, Note 2 matured. Note 2 was not modified again. Douglas and Janet had not paid the balance of Note 2 as of the trial date in November 2012.

On October 3, 2012, Braman again emailed Douglas: "I leave town on Friday for the month of October. We need to discuss the pay-off and modification before I leave. I'm running out of time to get this deal in process before I leave. Please contact me immediately." Douglas responded that he would call the next day and asked NASB to send him a copy of all of their loan contracts. Braman complied.

Braman did not believe he ever started drafting a modification agreement to cure the default because Douglas "was not agreeable" to Braman's proposal. Braman testified that Douglas told him "he would not sign a modification agreement and that he would not pay [NASB] any additional payments, and that he was going to, quote, unquote, beat this as he has done in other instances. . . [I]t became quite adversarial." Any attempt to cure the default stalled, and NASB initiated foreclosure proceedings.

On October 22, 2012, NASB sent a formal default notice to Douglas and Janet. The letter indicated Note 1 was in default and Note 2 had matured but remained unpaid. The letter indicated the events constituting default were failure to make payments and Keith's death. NASB had changed the rate of interest on the notes to the default rate on October 16, 2012. NASB had authority to do this under provisions of both notes.

7

On December 7, 2012, NASB filed a petition to foreclose on Douglas' and Janet's mortgages. NASB alleged Douglas and Janet had failed, neglected, and refused to make the payments due under Note 1 and Note 2 and Mortgage 1 and Mortgage 2, and they were in complete default and the conditions and covenants contained in said notes and mortgages had been broken. NASB claimed it had exercised its right to declare default and that notice of the default had been given. NASB intended to foreclose on the mortgages securing the notes.

NASB claimed the indebtedness owed as of November 1, 2012 was just over $800,000. NASB indicated the following entities might also assert an interest in the properties: Johnson County Board of Commissioners due to unpaid taxes; Leawood Estates Homes Associations due to a lien; Heartland Bank due to a mortgage; the federal government by virtue of additional tax liens; and/or Marks Nelson Vohland Campbell Radetic, LLC because of a judgment entered against them. NASB said its security interest had priority over any and all of those entities.

NASB requested that the district court order a foreclosure sale.

On February 13, 2013 and September 4, 2013, NASB filed its amended petition for mortgage foreclosure. Both amended petitions provided, "[Douglas and Janet] have failed, neglected and refused to make the payments due under [Note 1] and Note 2 and [Mortgage 1] and [Mortgage 2], and they are in complete default and the conditions and covenants contained in said notes and mortgages have been broken." Neither specifically mentioned Keith's death as an event of default.

On June 13, 2013, NASB filed a motion for partial summary judgment and memorandum in support. In summary, NASB argued there was no genuine issue of material fact that: (1) NASB was the holder of the note; (2) the notes were executed; (3) Douglas and Janet defaulted on the notes; and (4) the notes were not paid when due.

8

NASB asserted the default was when Douglas and Janet stopped making payments as of September 2012.

On July 8, 2013, Douglas and Janet responded that NASB was in breach of the note when NASB "demanded that [Douglas and Janet] pay $550,000 to NASB to pay off [Note 2]" plus a $400,000 pay down of Note 1. Douglas and Janet asserted that there was a genuine issue of material fact as to whether they had defaulted.

On July 23, 2013, NASB filed its reply in further support of partial summary judgment. In it, NASB argued Keith's death also constituted a default under the promissory notes.

On August 20, 2013, the district court issued its memorandum decision. The court determined it would not consider the new arguments NASB had made in its reply because they were raised for the first time, which denied Douglas and Janet a chance to respond. Further, the court found NASB failed to present evidence of Keith's death. The court determined there was controverted evidence whether a demand was made. The court denied NASB's motion.

There were additional motions and hearings unrelated to this appeal.

After a pretrial conference the district court issued its pretrial order. The order indicated it would supersede prior pleadings. Though it appears Douglas and Janet objected to the pretrial order as it indicates "[Douglas and Janet] contend that [NASB] is seeking an amendment of the pleadings and the amendment should not be allowed," they do not appear to have actually filed any written objections to the pretrial order because none are included in the record on appeal.

On November 25, 2013, the case proceeded to a bench trial.

9

At trial, Douglas and Janet argued that a guarantor is "not liable on the note. They are responsible for curing a default by the primary obligor, but . . . they are not the primary obligor and, therefore" not "a person liable here on" the note for purposes of triggering a default on the note They also argued NASB failed to comply with the procedural rules required to amend NASB's pleadings and failed to amend the pleadings to include all of the types of defaults NASB alleged at trial. They claimed NASB made an improper demand for $400,000 that was not legally enforceable. Douglas and Janet claim NASB was therefore the first to breach the note.

Braman testified that Note 1—the $590,000 note—was set to mature on April 1, 2034, and was secured by Mortgage 1. Mortgage 1 covered the Moonlight Road Tracts. It also originally covered a house, but the house was sold and released from the mortgage. The Belinder House was later added as additional collateral to Note 1.

Braman also testified that Note 2—the $155,000 note—was originally set to mature on February 1, 2007 originally. Note 2 was modified multiple times with a final maturity date of October 1, 2012, and Note 2 was secured by Mortgage 2. Mortgage 1 also covered the Moonlight Road Tracts and the Belinder House.

Braman testified Keith's death triggered the default, but there were also other defaults. On May 14, 2012, Braman received word of Keith's death through an email from Douglas. Douglas requested a waiver of late fees and reporting a late payment. Braman complied with Douglas' request.

NASB's attorney attempted to elicit testimony from Braman about being served with tax lien documents against Janet. Douglas and Janet objected because the issue was not pled or included in the pretrial order. The court took the objection under advisement. Braman indicated the tax liens affected NASB's confidence in Douglas' and Janet's ability

to make payments. Braman testified Douglas and Janet were highly reliant upon Keith's assets and many of their personal financial statements included Volkland Family Trust assets.

NASB sought to admit documents that provided the amount Douglas and Janet allegedly owed in late fees, interest, a payment history, and attorney fees through November 30, 2013. The parties assumed judgment would not be entered prior to that date, and Douglas and Janet objected to certain portions of the amounts included on the exhibits and to NASB's printout of the payment history. The district court deferred ruling on the objection.

Douglas' and Janet's attorney indicated that his focus while cross examining Braman was his belief that NASB breached the loan agreements first by "demanding the $400,000 and by demanding that [Douglas and Janet] execute a modification agreement."

Braman testified NASB's documentation showed a balance due of $804,694 and a 1 million dollar valuation of the collateral. Braman indicated they first attempted to modify the loan and requested a paydown of Note 1 by $260,000 and payment in full of Note 2, or NASB would foreclose, regardless of the value of the collateral.

Braman testified that Douglas and Janet had made late payments "on multiple occasions" but NASB never took an "adversarial stance with them on the issue." Therefore, the internal reports regarding their payment history indicated Douglas and Janet had previously maintained a good payment history. But, the report indicated at least four late payments in a period of 16 months. However, they were not past due as of September 2012 when Braman emailed Douglas about working to cure the default. Braman also testified NASB suspected Douglas and Janet were not residing in the home.

11

Much of Douglas' and Janet's cross examination of Braman attempted to establish their payment history, though Braman referred to the death of Keith as the occurrence that triggered the initial default.

Douglas testified that Keith's will had been lost and Douglas had not opened a probate estate. Douglas said he paid some of Keith's creditors, including hospital and therapy bills, from trust funds.

Douglas testified he was not able to review the loan documents prior to signing. He and Janet did not have legal counsel when they signed the documents either.

Douglas acknowledged he never paid back Note 2. He said he refused to pay off Note 2 because NASB was going to declare them in default for Note 1 unless he paid down a large sum on Note 1. When NASB's attorney cross-examined Douglas, he was extremely evasive with answers. NASB's attorney repeatedly asked Douglas what "default" he thought Braman was referring to when Braman emailed him on September 18, 2012. Douglas refused to answer the question multiple times, and the judge interrupted:

> "Holy cow. How many times is [NASB's attorney] going to have to ask the question.
> "[Douglas' and Janet's attorney], do we need to take a break so you can talk to your client for a moment? I mean, this is a simple question.
> ". . . . Look right here. I am really getting impatient with you."

After being asked multiple times by both NASB's attorney and the judge, Douglas finally admitted he knew the default Braman referred to in his September 18, 2012 email was Keith's death.

12

After the close of evidence, the district court took the matter under advisement and requested the parties provide their proposed conclusions of law.

After trial, Douglas' and Janet's attorney was allowed to withdraw based on their failure to pay attorney fees.

NASB provided a statement of facts not in dispute and additional facts not stipulated to by Douglas and Janet. NASB provided its proposed conclusions of law, and on March 7, 2014, NASB provided its proposed conclusions of law for both this case and the companion case. Douglas and Janet also submitted their proposed conclusions of law. NASB also responded to Douglas' and Janet's objections to their additional facts not in dispute and to Douglas' and Janet's proposed conclusions of law.

On May 23, 2014, the district court issued its journal entry of judgment. The court made extensive findings. In relevant part, the court found that Douglas and Janet had executed two promissory notes and accompanying mortgages delivered to NASB. NASB was still the rightful holder of Note 1, Mortgage 1, Note 2, and Mortgage 2. Keith had personally guaranteed the payment and satisfaction of Note 1. Note 1 and Note 2 each specifically indicated Keith's guaranties were considered loan documents. The financial condition of Douglas and Janet did not support the loans without Keith's guaranties. Keith died on May 4, 2012.

Mortgage 1 provided that Keith's death was an occurrence of default. The notes provided that an event of default was "'if any person liable hereon . . . shall die." And, a default under the mortgage was a default under Note 1 and Note 2. Therefore, Keith's death was a default under Mortgage 1, which was in turn a default under Note 1, Note 2, and Mortgage 2.

13

Both notes provided that upon default, the interest rate would automatically increase to the default rate. The total amount claimed under Note 1 through November 30, 2013, was $765,023.24; the total amount claimed due under Note 2 through November 30, 2013, was $155,747.70.

Douglas and Janet stopped making payments in September 2012. On October 1, 2012, Note 2 matured. They failed to repay Note 2 before NASB commenced foreclosure proceedings. NASB delivered written demand letters to Douglas and Janet on October 22, 2012.

Braman had discussed with Douglas the undercollateralization of the loans and Keith's death as events of default. Neither Braman nor the default letters cited a "problem with a tax lien, any problem with the failure of [Douglas and Janet] to provide updated financial information, any problem with late payments, any problem with the maintenance or condition of the collateral, any problem with the failure to open a probate estate, nor any problem with the escrow balance."

Despite being cited in the pretrial order, there was "little to no evidence" at trial about an event of default based upon false statement made by Douglas or Janet, their failure to maintain the Belinder House, or a failure to maintain an escrow balance.

NASB did not request an appraisal of the properties during the pendency of this litigation, nor was NASB aware of any appraisal ever being executed on the Moonlight Road Tracts.

The district court then made its conclusions of law:

Douglas and Janet allegedly objected to many of the grounds of default alleged in the pretrial order that had not been alleged in the petition or amended petition. However,

14

if their objections were written and filed with the district court, they are not included in the record on appeal. The court sustained all of the objections except as to the death of Keith as an event of default. Though the petition did not specifically allege Keith's death as an event of default, the court found that Douglas and Janet could not claim unfair surprise as NASB included this ground in its default letters and in its reply in further support of partial summary judgment. The court then found that based on the plain language of the notes, Keith's death was a default under Note 1 and Note 2.

Ultimately, the district court found that Douglas and Janet had signed a promissory note secured by a mortgage, NASB was the valid holder of the notes and mortgages, and Douglas and Janet had defaulted. As such, Douglas and Janet were liable to pay all amounts due under the note and NASB was entitled to foreclose on the mortgages to receive payment.

The district court rejected NASB's argument that Douglas and Janet had abandoned the Belinder House and found they were entitled the full 12-month redemption period under K.S.A. 2014 Supp. 60-2414(a).

NASB submitted an exhibit demonstrating the attorney fees requested. However, "[a]ttorney fees and interest in expenses after November 30, 2013 are yet to be submitted."

On June 18, 2014, NASB filed a motion for order of sale for all three properties. On June 19 and 20, 2014, the district court issued its order for the sale of the properties.

On June 23, 2014, Douglas and Janet filed a notice of appeal. On June 30, 2014, NASB filed their notice of cross-appeal.

NASB allegedly filed a motion to amend, but it is not included in the record on appeal and cannot be found in the district court's docket sheets. On July 12, 2014, Douglas and Janet filed their memorandum in opposition of NASB's motion to amend.

This appeal was docketed on July 24, 2014.

On August 4, 2013, NASB provided an itemization of the judgment and sheriff's return. On August 8, 2014, Douglas and Janet filed a motion requesting that NASB be ordered to pay them any surplus from the sheriff's sale and their objection to the confirmation of the sales. On October 2, 2014, NASB responded, arguing there was a deficiency due to accumulating attorney fees and post judgment interest. On October 8, 2014, the district court issued its journal entry denying Douglas' and Janet's motion. The court confirmed the sheriff's sales and issued its amended itemization of the judgment on October 30, 2014.

Additional facts are included below.

*Choice of Law*

Both of the notes and the guaranties provide that Missouri law should govern them. "'Generally the party seeking to apply the law of a jurisdiction other than the forum has the burden to present sufficient facts to show that other law should apply.' . . . [Citation omitted.] In addition, we note that Kansas courts have often leaned toward a lex fori, or law of the forum, approach, opting to apply Kansas law absent a clear showing that another state's law should apply. [Citations omitted.]" *In re K.M.H.*, 285 Kan. 53, 60-61, 169 P.3d 1025 (2007). "No choice of law question is presented when the laws of the involved states do not differ on substantive issues." *Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 275 Kan. 698, 732, 71 P.3d 1097 (2003).

16

"Even if another State's law applies to substantive issues in a case, the well-recognized rule under Kansas law and traditional choice-of-law principles is that procedural issues in a case are controlled by the law of the forum." Bezek *Conflict of Laws in Kansas: A Guide to Navigating the Dismal Swamp*, 71 J.K.B.A. 21, 31 (Sept. 2001); see *Kokenge v. Holthaus*, 165 Kan. 300, 307, 194 P.2d 482 (1948).

To the extent we consider substantive issues concerning the notes and guaranties, we will consider Missouri law.

Broadly speaking, Douglas' and Janet's first issue really challenges the district court's determination that NASB could foreclose on their mortgages. Here, the district court found in favor of NASB after a bench trial. It issued its findings of facts and conclusions of law upon which it based its opinion.

When reviewing a mixed question of fact and law, an appellate court applies a bifurcated review standard. The court's factual findings are generally reviewed under the substantial competent evidence standard. Its conclusions of law based on those facts are subject to unlimited review. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

The parties and the district court applied Kansas law to the foreclosure proceedings.

"'The main purpose of a mortgage is to insure the payment of the debt for which [it] stands as security; and foreclosure is allowed when necessary to carry out that objective.' [Citation omitted.]" *MetLife Home Loans v. Hansen*, 48 Kan. App. 2d 213, 218, 286 P.3d 1150 (2012). In order for a district court to allow foreclosure, the note holder must prove: (1) the defendant signed a promissory note secured by a mortgage, (2) the plaintiff is the valid holder of the note and the mortgage, and (3) the defendant has

17

defaulted on the note. See *Cornerstone Homes v. Skinner*, 44 Kan. App. 2d 88, 97-98, 235 P.3d 494 (2010). Missouri law is substantially similar. To recover on a promissory note in Missouri, "the plaintiff must (1) produce the note (2) signed by the maker and (3) show the balance due. [Citation omitted.]" *Fed. Nat. Mortgage Ass'n v. Bostwick*, 414 S.W.3d 521, 526 (Mo. App. 2013).

We will consider whether the district court's findings of facts are supported by substantial competent evidence. We will review the ultimate conclusion with no deference to the trial court.

*Did Douglas and Janet sign a promissory note secured by a mortgage?*

The first element of a Kansas foreclosure action involves the exchange of money and the promise to pay it back. Here, the parties do not dispute that Douglas and Janet signed a promissory note secured by a mortgage. These documents are included in the record, Braman testified that Douglas and Janet signed the notes secured by mortgages, and Douglas acknowledged the same. Therefore, the district court's finding that Douglas and Janet executed two promissory notes on NASB's behalf is supported by substantial competent evidence.

The first element of a foreclosure action governed by Missouri law would also be satisfied as NASB produced the notes, which are included in the record on appeal.

*Was NASB the valid holder of the notes and mortgages?*

In order for NASB to foreclose on the notes and mortgages, it must be the valid holder of the notes and mortgages. Again, the parties do not challenge whether NASB was the valid holder at all relevant times. The following is included in the Statements of Facts Not in Dispute provided on January 21, 2014: "NASB is still the rightful holder of

18

[Note 1], [Mortgage 1], the Note 2 and the Mortgage 2." Therefore, the district court's finding that NASB was the valid holder of the notes and mortgages is also supported by substantial competent evidence.

The second element of a Missouri foreclosure element is again satisfied. It is undisputed that Douglas and Janet signed the notes.

*Was there a default?*

This is where the dispute lies. Douglas and Janet claim multiple errors in the district court decision, including: (1) the court should not have considered an "unpleaded event of default;" (2) because NASB was the first to breach when it demanded a $400,000 paydown and failed to cure the breach, the court should have determined NASB was not entitled to interest on the note; (3) Keith's death was not a default under the notes because Keith was not "liable hereon;" and (4) because the default letters do not claim a default under the mortgages, NASB cannot rely on default provisions of the mortgages to establish a proper acceleration of the loan. In sum, they allege "there were no events of default, the loans were improperly accelerated[, and] NASB made a series of improper demands for payment." Douglas and Janet urge us to reverse the judgment of foreclosure.

Without citing any authority, Douglas and Janet assert our "review of the circumstances of an event of default are limited to those defaults set forth in NASB's First Amended Petition." Without citing to the record, Douglas and Janet claim "no motion to amend the pleading was even requested on behalf of NASB." Without citing to any authority or the record, they claim the district court committed error in basing its ruling upon an unpleaded event of default.

19

Because Douglas and Janet consistently failed to cite to the record or to any authority, we could deem this issue waived and abandoned. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011) (an issue not briefed is deemed abandoned and waived); Supreme Court Rule 6.02(a)(4) (Kan. Ct. R. Annot. 40) (we may presume facts made without citation to the record are unsupported)

However, we will consider the issue. To address this challenge, we must consider NASB's petition and the pretrial order.

> "Under Kansas law, a petition is not intended to govern the entire course of the case. *Berry v. National Medical Services, Inc*., 292 Kan. 917, 918, 257 P.3d 287 (2011). In fact, under Kansas' liberal notice-pleading rules, the only information Plaintiffs were required to include in their petition was: '(1) A short and plain statement of the claim showing that the pleader is entitled to relief; and (2) a demand for judgment for the relief to which the pleader deems such pleader's self entitled.' K.S.A. 60-208; see also *Oller v. Kincheloe's, Inc.*, 235 Kan. 440, 446-48, 681 P.2d 630 (1984) (outlining various principles underlying concept of notice pleading under Kansas law). Plaintiffs were under no obligation to categorize their causes of action or cite statutory authority or common-law bases for the suit. See *Golden v. Den–Mat Corporation*, 47 Kan. App. 2d 450, 461, 276 P.3d 773 (2012)." *Smith v. Philip Morris Companies*, 50 Kan. App. 2d 535, 547, 335 P.3d 644 (2014).

Further, "[t]he pretrial order supersedes any pleadings and has the effect of amending the pleadings to conform to it. K.S.A. 2008 Supp. 60-216(e)." *Unruh v. Purina Mills, LLC*, 289 Kan. 1185, 1191, 221 P.3d 1130 (2009). "A trial court should not grant a motion to amend a pretrial order to conform to the proof as to issues before the jury if the granting of such motion would result in injustice or disadvantage to the opposing party." *Hibbert v. Ransdell*, 29 Kan. App. 2d 328, Syl. ¶ 7, 26 P.3d 721 (2001); see K.S.A. 2014 Supp. 60-215(b).

20

Supreme Court Rule 140(g) (2014 Kan. Ct. R. Annot. 254) requires any objection to the pretrial order to be filed within 14 days of the pretrial order in order to preserve the objection for appeal. ("If a party objects to a pretrial order, the objection must be filed, with a copy of the pretrial order attached. An objection must be filed not later than 14 days after the pretrial order is filed unless trial begins in that 14-day period, in which case the objection must be filed at the beginning of trial."); see also *Unruh*, 289 Kan. at 1191-92 ("If a party has an objection to a pretrial order, the party must file the objection in writing with the district court. [Citation omitted.] A party generally must make a timely objection to a district court ruling in order to preserve an issue for appeal.")

NASB's amended petition listed nonpayment and complete default of the conditions of the note as the occurrence of default. The district court's pretrial order included the following as events of default under the notes: late note payments; Keith's death; misrepresentations about Volkland Family Trust investments; impairment of repayment prospects; failure to complete remodeling of the Belinder House and resulting damage; and defaults under the mortgages on the Belinder House.

The pretrial order included the following as events of default under the mortgages: Late note payments; Keith's death; misrepresentations about Volkland Family Trust investments; impairment of the prospect of payment; failure to maintain the property; failure to furnish financial statements; failure to keep escrow funded; and defaults under the promissory notes

The pretrial order also expressed NASB's position that the pretrial order superseded earlier pleadings, and therefore negated any need to supplement or amend the pleadings. Allegedly, Douglas and Janet objected to the pretrial order, but if they filed any objections with the court, they are not included in the record on appeal.

21

On appeal, Douglas and Janet contend NASB essentially requested an amendment to the pleadings, which should not be allowed. The district court determined the pretrial order "shall supersede the pleadings and control the future course of this action unless modified to prevent substantial injustice." The court sustained Douglas' and Janet's objections to the additional grounds of default except to the extent NASB alleged Keith's death was a default. Douglas and Janet claim this was an error.

Though neither party addresses the issue, it does not appear that Douglas and Janet filed a written objection to the pretrial order in compliance with Supreme Court Rule 140(g) (2014 Kan. Ct. R. Annot 254.) and therefore have not preserved their objections for appeal. *Unruh*, 289 Kan. at 1191-92. Therefore, we could decline to review whether the district court properly determined Keith's death was a triable issue.

However, a brief review of relevant law and the record on appeal indicates no error in the district court's action.

The law of the forum governs the pleadings. *Kokenge v. Holthaus*, 165 Kan. 300, 307, 194 P.2d 482 (1948). The control of pleadings is within a district court's discretion. *Rolwing v. Nestle Holdings, Inc.*, 437 S.W. 3d 180, 184 (Mo. 2014), *as modified* (Aug. 19, 2014); *Smith v. Philip Morris Companies*, 50 Kan. App. 2d at 586. We will reverse only if the district court's decision was based on an error of fact or law or was unreasonable. *Philip Morris Companies*, 50 Kan. App. 2d at 586-87.

In Kansas, we recognize broad notice pleading principles. 50 Kan. App. 2d at 587. Our Supreme Court has identified narrow exceptions when a district court should decline to consider an issue not raised in initial pleadings:

"(1) undue delay, (2) bad faith or dilatory motive on the part of the movant, (3) repeated failure to cure deficiencies by amendments previously allowed, (4) undue prejudice to the

22

opposing party by virtue of allowance of the amendment, and (5) futility of amendment. *Johnson*, 259 Kan. [305,] 327, 913 P.2d 119 (1996)." *Philip Morris Companies*, 50 Kan. App. 2d at 587.

Based on our pleading principles, the district court was within its discretion when it determined Keith's death as a default was raised in a timely fashion.

The district court found:

"[I]t is true that this ground . . . was not pled in either the original Petition or the Amended Petition for Mortgage Foreclosure. However, it is undisputed that the default notice letter sent to [Douglas and Janet] stated that the death of [Keith] was a default. In addition, this theory was set out in NASB's Reply in Further Support of Motion for Partial Summary Judgment. As a result, there is no unfair surprise to [Douglas and Janet] that NASB would rely upon the death of [Keith] as grounds for default."

Douglas and Janet have failed to establish the district court abused its discretion when it determined they would not be unfairly surprised by allowing NASB to move forward on a theory of default they had plenty notice of in spite of NASB's failure to include it specifically in the pleadings. The district court correctly noted that NASB's default letters mentioned Keith's death, as did their reply in support of partial summary judgment. And, though he was hesitant to admit it on the stand at trial, Douglas knew Keith's death was the default Braman referred to in his September email to Douglas. This was a reasonable, logical decision. We next must determine whether Keith's death was a default under the notes.

On appeal, Douglas and Janet present an argument about the "first to breach" rule and claim that Keith was not considered liable hereon as to the notes so his death should not constitute an event of default. However, we must determine whether the district court's factual findings allowing foreclosure are supported by substantial competent

23

evidence and then review the legal conclusion of whether NASB should be entitled to foreclose with no deference to the district court.

The district court found that Keith had died on May 4, 2012. Because Keith's death certificate is included in the record, this factual finding is supported by substantial competent evidence. We turn to whether his death was a default under the notes.

Both the Notes and Keith's guaranty agreements provide they are governed by Missouri law. The district court applied both Kansas and Missouri law of contract interpretation when determining this issue, and the parties do as well on appeal. We will consider both.

In Kansas, appellate courts exercise unlimited review over the interpretation and legal effect of written instruments and are not bound by the lower court's interpretations of those instruments. *Prairie Land. Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, Syl. ¶2, 323 P.3d 1270 (2014). Promissory notes and mortgages are contracts between the parties, and the ordinary rules of construction applicable to contracts apply to them. *Carpenter v. Riley*, 234 Kan. 758, 763, 675 P.2d 900 (1984); *Deutsche Bank Nat. Trust Co. v. Kaplan*, No. 111,433, 2015 WL 1636819, at *2 (Kan. App. 2015) (unpublished opinion). The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction. *Stechschulte v. Jennings*, 297 Kan. 2, 15, 298 P.3d 1083 (2013).

When two or more instruments are executed in the course of the same transaction and concern the same subject matter, they may be construed together. See *Hollenbeck v. Household Bank*, 250 Kan. 747, 752, 829 P.2d 903 (1992) (construing multiple IRA documents together to determine intent of parties); *Giefer v. Swenton*, 23 Kan. App. 2d

24

172, 179-80, 928 P.2d 906 (1996) (a deed and two unprobated wills could not be construed together because it was "mixing apples and oranges.").

Missouri law is substantially the same as Kansas law. In Missouri:

"The '[i]nterpretation of a contract is a question of law, which this [c]ourt reviews de novo.' *Goldstein & Price, L.C. v. Tonkin & Mondl, L.C.,* 974 S.W.2d 543, 551 (Mo. App. 1998) (citing *Leggett v. Mo. State Life Ins.*, 342 S.W.2d 833, 850 (Mo. Banc 1960)). '[T]he cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent.' *Mo. Consol. Health Care Plan v. BlueCross BlueShield of Mo.*, 985 S.W.2d 903, 909 (Mo. App. 1999) (quoting *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. Banc 1995)). 'In interpreting a contract, we must use the plain, ordinary, and usual meaning of the contract's words and consider the whole document.' *Id.* (citations omitted). Where a written contract is unambiguous and complete on its face, parol evidence may not be introduced to vary or contradict the terms of the agreement. *Jake C. Byers, Inc. v. J.B.C. Invs.*, 834 S.W.2d 806, 811 (Mo. App. 1992)." *Helterbrand v. Five Star Mobile Home Sales, Inc.*, 48 S.W.3d 649, 658 (Mo. App. 2001).

"In order to determine the intent of the parties, it is often necessary to consider not only the contract between the parties, but 'subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances that cast light on the intent of the parties.'" *Butler v. Mitchell-Hugeback, Inc.,* 895 S.W.2d 15, 21 (Mo. 1995).

When "the contract consists of multiple documents, all of the documents must be read together in an effort to 'capture what was intended.' [Citation omitted.]" *Knob Noster R-VIII School Dist. v. Dankenbring*, 220 S.W.3d 809, 816 (Mo. App. 2007).

Under both Kansas and Missouri law, we must first look to the language of the contract itself. If it is clear, we need not look outside the contract to ascertain the intent of the parties.

Here, the notes provide the following as events of default under the note: "(b) if default is made . . . in any Loan Document . . .; (c) if any person liable hereon . . . shall die." The loan documents included the mortgage and Keith's guaranty. The mortgage also had a provision on events constituting a default, which included that the "*death of any* Grantor or *Guarantor*" was an event constituting a default.

The notes clearly indicate that a default under any loan document, including the mortgage, constituted a default under the notes as well. Keith's death was a clearly articulated event of default under the mortgage. Therefore, the terms of the contract are clear and we need not apply the rules of construction to determine whether Keith's death was an event that triggered default under the notes. It was. The district court correctly determined this.

Regardless of whether Keith was "liable hereon" the notes themselves, his death constituted a default under Mortgage 1, which constituted an independent default under the notes.

The loan documents indicated Keith was "liable hereon" the notes for purposes of his death triggering a default. Note 1 provides that the "Guaranty Agreements from E. Keith Volkland" are considered "Loan Documents" "securing the indebtedness" under the Note. Therefore, we can consider Guaranty 1 when attempting to ascertain the intent of the parties regarding Keith's liability. *Dankenbring*, 220 S.W.3d at 816 (when the contract itself consists of multiple documents, they must be read in accord).

26

The guaranty agreements provided that Keith "unconditionally guarantees the payment and performance, upon demand, of all Obligations of Borrower to Lender." "Obligation" is defined as "any and all present and future advances, liabilities, indebtedness and obligations of Borrow to Lender, however evidenced, created or incurred, whether now existing or hereafter acquired or extended . . . Guarantor's liability hereunder includes . . . all Obligations to Borrower to Lender arising under or relating to the Note." Keith was liable on the notes to the same extent as Douglas and Janet.

Based on the plain language of the documents, Keith was clearly considered liable hereon. He was unconditionally liable for the payment of the notes. Therefore, the district court properly determined Keith's death was an independent default under Note 1.

Because Keith's death on May 4, 2012 was a default, Douglas' and Janet's argument that Braman's proposal of modification in September 2012 was the first breach fails.

The district court's factual findings supporting its determination that NASB was entitled to foreclose are supported by substantial competent evidence. Our independent review of whether NASB was entitled to foreclose indicates that it was. Douglas and Janet executed two promissory notes to NASB secured by mortgages, NASB was the holder of the notes and mortgages at all relevant times, and Keith's death triggered a default of both the notes and the mortgages. Therefore, the district court's ultimate conclusion was the correct one.

Douglas and Janet also claim the district court should have granted their request for equitable relief. They contend they had established a sound basis for which the court could refuse to enforce the foreclosure and instead invoke its powers of equity.

27

Under Kansas law, "'the application of an equitable doctrine rests within the sound discretion of the trial court. [Citation omitted.]'" *National City Mortgage Co. v. Ross*, 34 Kan. App. 2d 282, 287, 117 P.3d 880, *rev. denied* 280 Kan. 984 (2005). A district court abuses its discretion only when no reasonable person would have taken the view adopted by the court or if its decision is based on a factual or legal error. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). The party asserting that the trial court abused its discretion bears the burden of showing this abuse of discretion. *State v. Wells*, 289 Kan. 1219, 1227, 221 P.3d 561 (2009).

In *First Nat. Bank of Omaha v. Centennial Park*, 48 Kan. App. 2d 714, 303 P.3d 705, *rev. denied* 297 Kan. 1244 (2013), the court discussed a district court's decision to reject the use of its equitable powers to prevent the acceleration of a loan balance.

The *Centennial Park* court was tasked with determining whether a district court had abused its discretion when it decided not to invoke its equitable powers to relieve the defendants of acceleration based on a "technical default." 48 Kan. App. 2d at 720. There, the bank interpreted the loan requirements to require a larger payment upon default than it actually required. 48 Kan. App. 2d at 723. We said,

> "While there seems to be no Kansas precedent involving the defendants' particular argument, Kansas law recognizes similar equitable principles. Specifically, our Supreme Court has stated the following:
>
>> '[I]f the default was induced by the fraudulent or inequitable conduct of the creditor, or by any agreement or promise upon which the debtor might rely which operated to mislead or throw the debtor off his guard, a court of equity would interfere to stay proceedings, or the action might be abated upon the facts being properly pleaded.' *Snyder v. Miller*, 71 Kan. 410, 421, 80 P. 970 (1905).
>
> . . . .

28

"In the absence of direct authority, we will draw guidance from several factors in determining whether equitable principles should be used to relieve a mortgagor from acceleration after default. The factors are the following: (1) the conduct of the parties; (2) the amount paid in reduction of the debt; and (3) the improvements made on the property by the mortgagor. Moreover, a court should consider whether the default resulted from accident, mistake, or inequitable conduct of the mortgagee. Nevertheless, as stated earlier, *courts should use their power to refuse to accelerate the maturity of a debt on equitable grounds sparingly and should refuse to foreclose a mortgage only under limited circumstances*." (Emphasis added.) 48 Kan. App. 2d at 722.

Here, in their posttrial conclusions of law, Douglas and Janet urged the district court to use its equitable powers to refuse to accelerate "the loans based upon purely technical grounds." They relied on *Centennial Park* and suggested they had demonstrated "good faith performance and a good payment history." Douglas and Janet contend their recent late payments were "minor problems." On appeal, Douglas and Janet make the same arguments.

NASB urges us not to consider this issue because Douglas and Janet failed to request equitable relief in the pretrial order and therefore the district court did not make any factual findings on the issue.

Generally, issues not properly raised before the trial court cannot be raised on appeal. See *State v. Bowen* 299 Kan. 339, 354, 323 P.3d 853 (2014); *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014).

Regardless of Douglas' and Janet's failure to raise this issue in the pretrial order, the district court was within its discretion when it declined to invoke equitable principles. Douglas and Janet face a difficult task establishing no reasonable person would have refused to invoke equitable principles. The *Centennial Park* court determined "[e]quity cannot excuse [the defendant's] failure to pay because none of the equitable principles

29

that it relies on are present here. . . . no basis existed for the application of an equity defense preventing acceleration in this case." 48 Kan. App. 2d at 724. More importantly, in *Centennial Park*, the court noted the lack of evidence of the defendant's "'honest endeavor'" to pay the money it owed. 48 Kan. App. 2d at 724.

The same can be said here. Nothing about NASB's conduct suggests Douglas and Janet are entitled to equitable relief. The record indicates they had not paid down much of their debt; there was no evidence of improvement of any of the properties; and the default did not result from accident, mistake, or inequitable conduct. Nor was there an honest endeavor on Douglas' and Janet's part to pay NASB what they owed. Douglas and Janet refused to negotiate a modification of Note 1 to cure the default, and when NASB declared default, they stopped paying altogether on Note 1 and never paid back Note 2, even after it matured. These are not the type of limited circumstances warranting the invocation of the district court's equitable powers.

As such, we affirm the district court's decision not to invoke equitable principles.

Douglas and Janet also challenge the district court's award of attorney fees to NASB. They claim the award is inappropriate because NASB failed to segregate the fees incurred in this case from those incurred in district court case No. 12-CV-8619 (Court of Appeals case No. 112,145).

"The question of whether a court has the authority to award attorney fees is a question of law over which an appellate court has unlimited review. [Citations omitted.]" *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 162, 298 P.3d 1120 (2013). A Kansas court may not award attorney fees unless a statute authorizes the award or there is an agreement between the parties allowing attorney fees. 297 Kan. at 162. Here, the promissory note contained an attorney fees clause that allowed NASB to collect attorney

fees for the enforcement of the note. The provision did not require NASB to prevail in order to collect attorney fees.

Where the district court has authority to grant attorney fees, "the amount awarded is reviewed for abuse of discretion. [Citation omitted.]" *Rinehart v. Morton Buildings Inc.*, 297 Kan. 926, 942, 305 P.3d 622 (2013).

Because Douglas and Janet challenge the amount of fees awarded, we will review for an abuse of discretion.

Even though the notes indicate they were governed by Missouri law, Douglas and Janet cite only to Kansas law in support of their request that we reverse the award of attorney fees. However, because the attorney fees provision is included in the notes, which is governed by Missouri law, we will consider Missouri law.

Missouri law on this issue appears to be well settled. The district court is vested with broad discretion to award attorney fees. *Scobee ex rel. Roberts v. Scobee*, 360 S.W.3d 336, 346-47 (Mo. App. 2012).

> "[A] party requesting payment of contractual attorney fees *must be the prevailing party*. See *Miller v. Gammon & Sons, Inc.*, 67 S.W.3d 613, 625 (Mo. App. W.D. 2001); see also *Porter v. Lake Waukomis Ass'n*, 687 S.W.2d 237, 239-40 (Mo. App. W.D. 1985) (refusing to grant attorney fees to association because it did not prevail even though there was no requirement in contract that it had to prevail, but only that it had to commence suit for the enforcement of its restrictions)." *Paradise v. Midwest Asphalt Coatings, Inc.*, 316 S.W.3d 327, 330 (Mo. App. 2010).

The district court's award of attorney fees was improper here because the attorney fees were awarded in one lump sum. NASB did not prevail in the companion case. NASB was not entitled to an award of attorney fees even though the contractual provision

31

allowing it to collect attorney fees did not require NASB's successful endeavor. Attorney fees were appropriate for the instant case No. 112,097, but not for case No. 112,145.

We therefore reverse the award of attorney fees and remand to the district court to determine the correct amount of attorney fees NASB is entitled to for its successful endeavor in this case.

Douglas and Janet next challenge the district court's jurisdiction to add additional interest to the amount they owed on the notes after our court docketed this appeal.

Whether jurisdiction exits is a question of law over which this court's scope of review is unlimited. *Frazier v. Goudschaal*, 296 Kan. 730, 743, 295 P.3d 542 (2013).

This court has recognized: "A trial court does not have jurisdiction to modify a judgment after it has been appealed and the appeal docketed at the appellate level." *In re Estate of Robinson*, 232 Kan. 752, 754, 659 P.2d 172 (1983).

However, appellate courts have reviewed issues decided by a district court after an appeal has been docketed out of "judicial economy." *ARY Jewelers, L.L.C. v. Krigel*, 277 Kan. 464, 473-74, 85 P.3d 1151 (2004) "[I]nstead of summarily remanding the interest issue—which is a meaningless exercise in light of paragraphs 6 and 7 of the district court's decision which resolved the issue on September 13, 2002, *i.e.*, the parties agreed to the rate at which interest would be earned on the escrowed funds—we will consider the interest issue out of judicial economy.; *Cf. Martin v. Martin*, 5 Kan. App. 2d 670, 674-75, 623 P.2d 527, *rev. denied* 229 Kan. 670 (1981) (Even where district court lacks jurisdiction to rule on a motion for new trial under K.S.A. 60-260, the preferable procedure is for that court to consider the motion, if warranted, to prevent inefficient adjudication of the issue.)." *ARY Jewelers*, 277 Kan. at 474.

In this case, NASB filed two motions for order of sale: (1) the Belinder House; and (2) the Moonlight Road Tracts on June 18, 2014. On June 19, 2014, the district court issued an order of sale for the Belinder House. On June 20, 2014, the court issued an order of sale for the Moonlight Road tracts.

On July 16, 2014, the Johnson County Sheriff Office provided its sheriff's return for one of the sales. The return does not provide which property it refers to, but it indicates the property was sold for $190,000 that day. NASB's itemization of judgment indicates the $190,000 bid was for the Belinder property.

On July 18, 2014, NASB filed motions to confirm the sheriff's sale for both the Belinder House and the Moonlight Road Tracts. NASB indicated there was a deficiency for both properties.

On August 4, 2014, Douglas and Janet filed their motion for order requesting the court order NASB to pay back the surplus from the sheriff's sales. Douglas and Janet argued that the amount bid at the sheriff's sale exceeded the amount of the judgment entered against them. (Douglas and Janet argued the judgment entered on May 23, 2014 indicated they owed the following amounts: (1) Note 1: $754,023.24; and (2) Note 2: $155,747.70. They claim the final bid for the properties was more than the amount owed for each note: (1) $760,000 for the Moonlight Road tracts, and (2) $190,000 for the Belinder House. They argue each property therefore generated a surplus, not a deficiency as NASB suggested. They challenge NASB's itemization of judgment on many grounds: (1) bad math, (2) misstatements, (3) no basis for determination of the redemption amount for each property, and (4) the judgment amounts are not itemized by the two notes.

On October 3, 2014, NASB responded. NASB contended that interest on the notes did not stop accruing at the sale and the additional interest created the deficiency. NASB indicated that the interest on Note 1 was $153.86 per day and on Note 2 was $51.03 per

33

day. NASB argued there were 226 days between November 30, 2013—the date the May 23, 2013, calculated interest through—and July 16, 2014—the date of the sheriff's sales—so it was entitled to additional per diem interest of $46,305.14. NASB further argued it was entitled to interest from the date of the sale through the confirmation date—which had not yet happened. Without explanation, NASB also indicated there were additional attorney fees owed of $21,033.05. Therefore, NASB argued, there was a deficiency, not a surplus.

On October 8, 2014, the district court issued its journal entry on Douglas' and Janet's motion for an order directing NASB to pay surplus proceeds into the court. The court also addressed NASB's request for confirmation of the sheriff's sale.

The district court found the May 23, 2014, journal entry clearly indicated the assessment of future attorney fees and interest: "Attorneys' fees and interest in expenses after November 30, 2013 are yet to be submitted." The court indicated NASB waived future attorney fees at a subsequent hearing, but interest continued to accrue. The court did not articulate a specific total amount Douglas and Janet owed, only that there would be no surplus by the time additional post judgment interest calculated. Douglas' and Janet's motion was denied and the court determined there was no reason not to confirm the sheriff's sale of the properties.

On October 30, 2014, NASB submitted its proposed order confirming the sheriff's sale. Douglas and Janet filed their written objection to the proposed order. On October 31, 2014, the district court issued its order confirming both sheriff's sales

Douglas and Janet argue the district court modified the judgment when it denied their motion requested surplus proceeds and confirmed the sheriff's sale. Contrary to their contentions, the court did not modify the May 23, 2014 judgment or award interest not already provided for in that judgment. As NASB notes, the court's actions were not a

34

modification of the May 23, 2014 journal entry, but instead was part of the execution of the judgment of foreclosure. See *L.P.P. Mortgage, Ltd. v. Hayse*, 32 Kan. App. 2d 579, 586, 87 P.3d 976 (2004).

Interestingly, Douglas and Janet filed their motion requesting surplus proceedings from the sheriff's sale after this appeal had been docketed. Yet, when the district court did not find in their favor, they now claim the district court's lacked jurisdiction to deny this motion.

However, because the district court's decision from October 8, 2012 clearly indicates it did not modify the May 23, 2014, order after the appeal was docketed, this challenge fails.

*Cross-Appellant's Issues*:

NASB requests that if we remand the case for additional proceedings, we review the district court's determination that certain issues not raised until the pretrial order were not triable. Because we have affirmed the foreclosure based upon a finding of default due to the occurrence of Keith's death, we need not address this issue at length.

As discussed in Douglas' and Janet's Issue I, the control of pleadings is left within the sound discretion of the district court. "Under notice pleading, the petition is not intended to govern the entire course of the case. Rather, the pretrial order is the ultimate determinant as to the legal issues and theories on which the case will be decided. [Citation omitted.]" *Unruh,* 289 Kan. at 1191.

NASB argues the district court improperly refused to consider certain issues raised in the pretrial order:  Untrue statements and/or representations about payment of loan obligations from securities; certificates of deposits and investments of the Volkland

35

Family Trust; impairment of the prospect of payment from assets of the Volkland Family Trust; failure of the Volklands to complete remodeling of the Belinder House; and damage to the house due to failure to repair a leaking roof and failure to maintain the home.

Each of these issues was presented in the pretrial order.

The district court deferred ruling on Douglas' and Janet's objections to these issues until trial, although it does not appear they conformed to Supreme Court rules governing objections to pretrial orders. The court made the following relevant findings:

> "76.  NASB's Amended Petition for Mortgage Foreclosure does not allege a default based upon tax liens, the escrow balance, the condition or remodeling of the collateral, false statements, the lack of a probate estate, late payments or a problem with not providing updated financial information to NASB.
> . . . .
> "78. . . . The Amended Petition for Mortgage Foreclosure alleges no default other than a default in payments due."

Therefore, the district court refused to consider these grounds of default and sustained Douglas' and Janet's objections to those grounds of default. The court determined those grounds constituted unfair surprise.

Because of our broad notice-pleading requirements, and the function of the pretrial order being the "ultimate determinant as to the legal issues and theories on which the case will be decided," the court should have overruled any objections to the pretrial order. See *Unruh,* 289 Kan. at 1191. NASB was not required to plead with specificity the theories of default in its petition. Instead, the function of the pretrial order is to ultimately determine the different theories of default. The court should have considered the various theories of default alleged in the pretrial order.

36

However, because we are affirming the foreclosure based upon Keith's death as default, any error was a harmless error. See *State v. Ward*, 292 Kan. 541, 568-69, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (an error that does not affect a party's substantial rights is harmless).

NASB also argues the district court erroneously determined Douglas and Janet had preserved their right to redemption. A 12-month redemption period was ordered. This ruling was probably correct, but the 12 months has run. The parties agree this issue is moot.

The judgment of foreclosure is affirmed. The case is remanded for recalculation of the attorney fees and judgment interest that NASB is entitled to in this case.

Affirmed in part and remanded with directions.